*1192
 
 Opinion
 

 RAMIREZ, P. J.
 

 A jury convicted Bobby Angelo Ansaldo of two counts of committing lewd and lascivious acts on a minor (Pen. Code, § 288, subd. (c)) and one count of attempting that offense (Pen. Code, §§ 664, 288, subd. (c)), three counts of offering methamphetamine to minors (Health & Saf. Code, § 11380), possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), and possession of burglary tools (Pen. Code, § 466). In bifurcated proceedings, the trial court found that Ansaldo had suffered three strike priors. He was sentenced to prison for seven consecutive twenty-five-year-to-life terms, plus one year, and appeals, claiming insufficiency of the evidence and sentencing error. We reject all of his contentions, save one concerning the imposition of a one-year term for an enhancement. Therefore, we affirm, while directing the trial court to remove references to that enhancement from the abstract of judgment.
 

 Facts
 

 A short time before May 30, 1995, Ansaldo, who did plumbing work, drove to the home of the first and second victims, who were 14-year-old twin sisters, in his utility truck, accompanied by the mother of the sisters’ friend. The mother asked the second victim if she wanted to work for her and Ansaldo. Ansaldo told the second victim that he wanted someone to do paperwork at his office, which was located in his home. The second victim left with the two.
 

 When the three arrived at Ansaldo’s home, Ansaldo told the second victim that he would pay her $5 per hour. The mother went into the backyard, and Ansaldo and the second victim went into Ansaldo’s office. Ansaldo typed the second victim’s name, address and date of birth into his computer. He told the girl that he had two businesses—doing plumbing work and photographing “kids” her age, without their clothes. He said that he was a dirty old man, being 53 years old, and had had an operation that would prevent him from getting anyone pregnant.
 

 He asked her how much she wanted to earn $5 per hour. He told her she would have to take off her shoes and shirt. He said he had been arrested before and he did not want her to tell the police about him. He asked her if she was a virgin and she said she was. He read her palm, telling her that she thought about sex a lot, but had not engaged in it. He said he had been arrested for picking locks, at which he was proficient. He stated that he could cut someone’s throat and he wouldn’t care. The comment frightened her.
 

 
 *1193
 
 He asked her if she did speed and he offered to give her some. When she declined his offer, he said that since she wasn’t indulging, neither would he in her presence. He added that he would do so later. He gave her $5.
 

 The following is the second victim’s testimony concerning Ansaldo’s solicitation of her to engage in sexual activities with him:
 

 “Q[ by the prosecutor:] Did he ask you if you wanted to have sex with him?
 

 “A[ by the second victim:] Not at that time but he asked me if I would.
 

 “Q[ by the prosecutor:] Tell us when he did it and what he said.
 

 “A[ by the second victim:] It was like towards the end of the interview, he says he would be willing to pay me to do it.
 

 “Q[ by the prosecutor:] Did he tell you how much money he would give you to have sex with him?
 

 “A[ by the second victim:] He never told me.
 

 “Q[ by the prosecutor:] He just said he would pay you?
 

 “A[ by the second victim:] Yes.
 

 “Q[ by the prosecutor:] What did you say to him about that?
 

 “A[ by the second victim:] I just told him I wouldn’t do it.
 

 “Q[ by defense counsel:] He asked you at that time if you would have sex with him?
 

 “A[ by the second victim:] . . . [H]e said like would I be willing to, not at that point in time.
 

 “Q[ by defense counsel:] Please finish.
 

 “A[ by the second victim:] He said sometime in the future if I like would.
 

 “Q[ by defense counsel:] Did he indicate to you any particular time in the future?
 

 
 *1194
 
 “A[ by the second victim:] No, he didn’t.”
 

 After the 2 had been in the office for 30 to 45 minutes, Ansaldo drove the second victim home, once again accompanied by the friend’s mother.
 

 On May 30, 1995, Ansaldo again drove to the first and second victims’ home in his utility truck, accompanied by their friend’s mother, this time encountering the first victim. The mother told the girl that she worked for Ansaldo and if the latter wanted, she could work for him, too. The first victim was to accompany Ansaldo on plumbing jobs Ansaldo would perform for females. She was to be paid $5 per hour.
 

 One or two days later, Ansaldo picked the first victim up at her home and took her to where he had a plumbing job. She held a flashlight while he unclogged a drain there. Ansaldo told the first victim that if she did a good job, she’d get paid more. He said that if she would make him happy, he’d make her happy. Ansaldo paid the first victim and dropped her off at her home.
 

 Two or three days later, Ansaldo again picked up the first victim at her home. She was not comfortable accompanying Ansaldo alone, so she brought along her 14-year-old friend, who was the third victim. The three went to Ansaldo’s home and Ansaldo took the first victim into his office there. He asked the first victim if she did speed. He also asked her if she or the third victim would tell the police about him.
 

 The third victim joined Ansaldo and her friend in the office after 10 minutes. Ansaldo had both type their names, addresses, dates of birth and ages into the computer. He told the girls that he had a perverted mind, that he liked to “eat girls [,]” to have them take off their clothes and watch them, to take pictures of them in the nude and “to fuck.” Ansaldo got a gray case out of his utility truck, picked the lock and opened it. He told the girls he used to be a burglar.
 

 Inside the case was a bindle of speed, which Ansaldo dumped out on a glass tile and divided with a razor. He put some into a glass pipe, which he smoked. He offered some to the girls and they partook. He fashioned lines on the tile and all three snorted the drug. In the kitchen, he offered the girls wine and all three imbibed.
 

 They adjourned to the living room where the three sat on the couch. Ansaldo told the girls he would pay them $10 each to orally copulate and masturbate him. They kept telling him that they wanted to go home. He said,
 
 *1195
 
 “. . . Do one thing for me and I’ll let you go home. I’ll pay you and let you go home.”
 

 Ansaldo told the girls that he had had an operation so that he could not have children. Although the first victim wanted to go home, the third victim agreed to Ansaldo’s request. He told her to utilize five or ten minutes for her activities and he took out a timer. He told her to pull his penis out of his pants but she refused. He said he’d make it easy for her and he pulled it out himself. He told the first victim she could begin when the third victim finished. With each of the victims, he placed his hand on top of hers as he guided her to hold his penis and moved her hands up and down it until the timer went off. Ansaldo ejaculated, gave each girl $20 and drove them home. He told them if they reported the incident, he’d deny it.
 

 After Ansaldo was arrested, methamphetamine, paraphernalia used to ingest it and burglary tools were found in his utility truck. Also in the truck was a hidden voice-activated tape recorder. A tape in the recorder contained the voices of Ansaldo and an unidentified female.
 
 [1]
 
 On the tape Ansaldo discusses a sexual encounter he had with that female and he bragged about his encounter with the first and third victims.
 

 A search of Ansaldo’s home uncovered a letter he had written to another underage female in which he described his encounter with the first and third victims, saying, of one of them, “[i]t will be a long time before she can catch up to you in my book . . . .” In Ansaldo’s computer was a portion of a sex manual he had written in which he stated, “ T am going to use the same words that I would use if I was in bed with your wife or girlfriend, sister or daughter.’ ”
 

 Issues and Discussion
 

 1.
 
 Insufficiency of the Evidence
 

 Relying principally on
 
 People
 
 v.
 
 La Fontaine
 
 (1978) 79 Cal.App.3d 176 [144 Cal.Rptr. 729], Ansaldo contends that the evidence is insufficient to sustain his conviction of attempted lewd and lascivious acts on the second victim. In
 
 La Fontaine,
 
 the defendant asked the victim if the latter wanted to make an easy $5 or $10. In answer to the victim’s question how, the defendant said, “ ‘I give you a blow job.’ ”
 
 (Id.
 
 at p. 179.) The victim said no and parted company with the defendant.
 

 
 *1196
 
 The Court of Appeal cited language that attempted to distinguish an act of preparation from a “ ‘ “direct” [unequivocal] ineffectual act done towards [the] commission’ ” of the crime, which is what is required for an attempt.
 
 (People
 
 v.
 
 La Fontaine, supra,
 
 79 Cal.App.3d at p. 181.) This language is really not helpful in dealing with the difficult question presented here. The holding of
 
 La Fontaine,
 
 however, does relate directly to the insufficiency of the evidence. The appellate court held that acts of solicitation are insufficient to constitute attempts. In so doing, it cited the same conclusion by another appellate court,
 
 People
 
 v.
 
 Adami
 
 (1973) 36 Cal.App.3d 452 [111 Cal.Rptr. 544].
 

 The holdings of
 
 La Fontaine
 
 and
 
 Adami
 
 concerning solicitation have not been adopted in any other published decision. Certainly, we are bound by neither decision. In light of the Supreme Court’s opinion in
 
 People
 
 v.
 
 Memro
 
 (1985) 38 Cal.3d 658 [214 Cal.Rptr. 832, 700 P.2d 446], the time may be at hand for a reevaluation of this position.
 

 In
 
 Mernro,
 
 the defendant invited the minor victim to his apartment to have a soft drink, but “[t]he invitation was probably a ruse for other contemplated activity, since [the defendant] indicated that he ‘had in the back of his mind’ that he would try to take pictures of the boy in the nude. [<][] Once inside, [the defendant] took [the victim] into the bedroom, turned on ‘black strobe lights,’ and sat down on the bed. The boy stood adjacent to the bed, watching the lights blink on and off. Suddenly, when [the victim] announced his departure, [the defendant] became angry, grabbed the clothesline and strangled him. Although [the defendant] confessed to binding [the victim]’s hands, he was unable to remember whether he tied the boy’s hands before strangling him, and no independent evidence established the timing of that act.
 
 [%
 
 No specific ‘plan’ vis-á-vis [the victim] had been formulated. Nevertheless, the ‘arrangement’ of lights, pornographic materials and other paraphernalia in [the defendant]’s apartment would suggest sufficient planning to enable [the defendant] to commit lewd conduct once a willing participant came along. HD It is true that the simple act of accompanying [the victim] up to [the defendant]’s apartment probably fell within the ‘zone of preparation.’ However, [the defendant] went beyond preparation. He ushered the boy into the bedroom to watch the strobe lights and stayed close by. These were steps which furthered his aim of readying [the victim] for a nude photography session which was, in all likelihood, intended to culminate in lewd conduct. These acts, therefore, constituted the ‘actual commencement of his plan’ and were sufficient to support an attempt. [Citation.] But for [the victim]’s abrupt decision to leave the apartment, it is likely that these steps would have resulted in a completed violation of [Penal Code] section 288. [Citation.]”
 
 (People
 
 v.
 
 Memro, supra,
 
 38 Cal.3d at p. 699.)
 

 
 *1197
 
 Language in
 
 Memro
 
 pertinent here is as follows: “ ‘[WJhenever the design of a person to commit a crime is clearly shown,
 
 slight acts
 
 done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.’ [Citations.]”
 
 (People
 
 v.
 
 Memro, supra,
 
 38 Cal.3d at p. 698, italics added.)
 

 There can be no doubt, based on Ansaldo’s strikingly similar methods of operation involving all three victims, that his intent to commit lewd and lascivious acts on the second victim was clearly shown. As
 
 Memro
 
 holds, in such a case, slight acts done in furtherance are all that is necessary. Ansaldo’s attempt to have the second victim ingest drugs, his comment, which frightened her, and his offer of money for sex went beyond mere preparation. The fact that
 
 she
 
 interpreted his request to be for sex at some future point is not determinative. The jury was free to infer that had she, like her sister, agreed to his request, Ansaldo would have proceeded, at that moment, with the lewd and lascivious acts, just as he had with the other two victims.
 

 2.
 
 Sentencing
 

 a.-c.
 
 *
 

 Disposition
 

 The trial court is directed to amend the abstract of judgment to omit the reference to the enhancement under Penal Code section 667.5, subdivision (b), and its one-year term, thus making the total term seven consecutive twenty-five-year-to-life terms. In all other respects, the judgment is affirmed.
 

 Richli, J., and Ward, J., concurred.
 

 A petition for a rehearing was denied February 11, 1998.
 

 [1]
 

 According to the probation report, the voice is that of a “young girl.” The report goes on to state that, on the tape, Ansaldo “asked [the girl] to sexually satisfy him in return for taking her shopping.” Review of the transcript of the tape, which was an exhibit at trial, reveals that Ansaldo twice mentioned taking this person shopping.
 

 *
 

 See footnote,
 
 ante,
 
 1190.