Opinion
SEPULVEDA, J.
Defendant Daniel Lee Herman was convicted of numerous charges of engaging and attempting to engage in lewd conduct with minors, and soliciting minors to engage in lewd conduct with him. On appeal he contends that (1) the statute governing criminal solicitation does not reach the conduct shown by the evidence; (2) the evidence was insufficient to support the convictions for attempted child molestation; (3) prosecution on certain 30-year-old charges was barred by the statute of limitations; (4) the admission of uncharged acts to support those older charges was an unconstitutional application of an ex post facto law; and (5) a pattern jury instruction concerning the relevance of uncharged acts is unconstitutional. We sustain the first contention and direct dismissal of the solicitation charges. In all other respects we affirm the judgment.
Background
Defendant was charged by consolidated information with 24 counts involving 11 victims. The oldest charges were five counts of lewd acts from *1373 1969 to 1972 upon Karen P., then defendant’s minor stepdaughter, in violation of Penal Code section 288, subdivision (a).[1] The majority of the remaining charges involved sexual advances, importunities, propositions, or similar conduct directed towards high school children from February to May 1998. One charge concerned an instance of alleged annoying of a child in December 1999.

Karen P.

The jury found defendant guilty of three counts of lewd acts upon Karen P., then a child under age 14 (§ 288, subd. (a)), between 1969 and 1972.[2] In support of the charges Ms. P. testified that when she was probably 10 years old, i.e., in 1969 or 1970, defendant took her into his workshop to show her how the lathe worked. He put his hand in her panties and put his finger into her vagina. This occurrence was repeated maybe three or four days later. She thought, but wasn’t sure, that it occurred a third time in the workshop. On another occasion defendant inserted his finger in her vagina in her bedroom.

Kathy H.

Karen P.’s sister, Kathy H., testified that defendant rubbed her pubic region on one occasion and felt her breast on another. These acts were not charged, perhaps for reasons of limitations. Karen and Kathy, along with their mother, also testified that defendant masturbated in their presence on a daily basis, spied on them while they bathed, and kept books with pedophilic themes.
The jury heard evidence of other uncharged acts from this era, including that defendant twice exposed himself to some girls riding horses near his house.

Michelle and Brandi

The jury convicted defendant of two counts of solicitation to join in the commission of lewd acts upon a child (§ 653f, subd. (c)) and two counts of attempted lewd acts upon a child (§§ 664, 288, subd. (c)(1)) based upon conduct directed toward Michelle and Brandi on February 24, 1998. Brandi did not testify, so these convictions rested largely on the testimony of Michelle.
*1374 Michelle testified that many children of junior high or high school age “hung out” at Anthony’s Liquors in Sebastopol because its pay phone “was the only phone in town that you could get calls back from, so people would go there after school to page people or get ahold of people.” On February 24, 1998, she and Brandi were there when the pay phone rang. Michelle answered.[3] The caller, who identified himself as “Shawn,” asked if “Sarah” was there. Michelle said nobody by that name was present. The caller asked Michelle “what [she] would do for money, sexually,” and “What would you do for $200?” She replied, “I’m not interested.” He said, “Do you suck dick?” and “[t]hat kind of stuff.” She couldn’t remember other exact words, but was “sure” the caller used other graphic or lewd words, including “really disgusting things.” She said, “We’re not interested.”
Not long after the phone call defendant appeared at Anthony’s in a car. After going into the store he “came up to” Michelle and Brandi, and asked, “Are you the two girls I talked to on the phone?” They asked who he was, and he said, “Shawn.” They said, “Ewh, we’re not interested.” Defendant pulled out money and held it in front of them, showing it to them. He invited them into his car and “wanted [them] to go with him around the comer to the park.”[4] They said, “We’re not interested, and then we’re like, We’re going to call the cops, or something like that. ... [ft] And he said, Well, just get out of here, then.” So they went to a Safeway store where Brandi “called the cops.”

Megan and Deanna

The jury found defendant guilty of two counts of solicitation to join in the commission of lewd acts upon a child (§ 653f, subd. (c)) and two counts of attempted lewd acts upon a child (§§ 664, 288, subd. (c)(1)) based upon conduct directed toward Megan and Deanna on March 17, 1998. The jury acquitted defendant of a charge of violation of personal liberty by violence, menace, fraud, and deceit (§ 236) directed toward Megan. The court dismissed a count for misdemeanor annoying of a child (§ 647.6, subd. (a)), directed toward Megan.
The testimony of Megan and Deanna established that a few days before March 17, Megan received a “[v]ery vulgar” call on the pay phone at Anthony’s. The caller “ask[ed] if there was anybody that. . . would want to do, any sex acts for money. Saying that he could make a young girl a *1375 millionaire [i]f there was any interest.” He “[pjretty much . . . said he was looking for young girls to . . . perform acts on him for money.” The conversation probably ended with her saying something like, “You’re disgusting, you’re a sicko,” and hanging up.
On the morning of March 17, before school, Megan again answered the pay phone at Anthony’s. The caller said “this is Shawn” and asked her what she looked like. She hung up. The phone rang again. She didn’t answer, but a boy named Blake did. She heard Blake describe her to the caller.
Early that afternoon, a group of children including Megan, Deanna, and Blake, were hanging around Anthony’s when the pay phone rang. Megan, who was expecting a call, answered. She recognized the voice as the same one she had heard that morning. The caller again identified himself as “Shawn,” said he was waiting at Ives Park, and that he “thought [she was] supposed to meet” him there. She hung up and reported the exchange to her friends. Blake then said that when he had spoken to the caller that morning, the caller had said that he wanted the girl to whom he had spoken to meet him at the park at 1:00 p.m. Blake might have told the caller “that we would be meeting him down there.”
Some of the youths, including Megan and Deanna and at least two male friends, decided to walk to the park to see the caller. When they got there, Megan and Deanna separated from their companions and went to the ladies’ bathroom. When they emerged, defendant approached them and said, “[M]y name is Shawn.” He told them to follow him to his car, about 150 feet away in a parking lot, so he could get a cigarette. The girls complied. Their friends were sitting on some grass about 15 to 25 feet from defendant’s car.
When they got to the car defendant got into the front seat. He opened the passenger door and invited or “directed” Megan to take a seat. She “sat on the ledge of the passenger door.” Deanna first stood outside the driver’s side, but then came around to Megan’s side.
Deanna testified that beginning during the walk to the car, and continuing after they got there, defendant “said he wanted to pay us for sex.” He asked if they would “do sexual acts for him.” He “said that he did it a lot. . . . [1[] . . . [T]hat he had sex with younger girls.” He said that “he would make [them] the richest girls at [their high school], if they did what he asked.” Megan testified that defendant said “that he could take us to his mansion on [the street where defendant lived]. That he could—that he had a friend that worked on Palm Drive, or that owned some sort of building, and that we could go there. Or he said he usually had done this at—on Barlow Road. I *1376 don’t know whereabouts. And that he had a lot of—or about five other men that were interested and involved with him in this, and that they would—we could go to any of those places also.” He said that “he had made many girls millionaires . . . that he could make us millionaires. He had many other people interested in this. He had friends he could hook us up with. He had places where we could go. People, older men that would spend money on us.”
Similarly, Deanna testified that defendant said “that he would make us rich, and that if we didn’t want to have sex with him, he has a lot of friends. And his older friends owned—they owned businesses in Sebastopol and they’re also as rich as him. And he told us—he just described his house. It was like a really large house with a lot of expensive things, and the cars that he drives are nice. He told us he was really wealthy and he would share that with us. And he would introduce us to a lot of older men that owned businesses in town that were also wealthy, [ft] . . . . [ft] . . . [H]e pulled his wallet out of his back pocket, I believe, and he just said to Megan, he said that he—kept pointing out that he wanted sex. And he pulled out his wallet to show money, and he pulled out like I think two $100 bills or something. He said, I’ll give you some of this now, and he said, after—if you were to do this for me, I’ll give you some after we do sexual acts. And he said that there was a place on Barlow Road that he went a lot, and he said that’s where— usually where he took young girls. And he also set up a place somewhere around Palm Drive Hospital. He said that his friend owned a business there, and that’s also where he went.”[5]
Megan testified that defendant handed her $20 and said, “Take this. This is good faith money. I know you girls probably don’t trust me, but my money is good, and this is so you trust me.” Megan tried to give him back the money, but he wouldn’t take it. Deanna denied that defendant actually gave any money to anybody, but recalled that “when he opened his wallet, he showed us the money and he like—like touched the money, and like he kind of started to hand it to Megan and just said, This is good faith money, [ft] And then she said, What’s that? [ft And he said, I’ll give you half now, and in good faith, after you do the deed, what I want, then I’ll give you the other half.”
Megan said that defendant “started describing what he liked and what he paid girls to do.” He said “[tjhat he likes when they suck his dick. He liked *1377 young girls, especially when their pussy was wet. Only if it got wet, though. That he liked a young mouth on him.” While he was saying this, “he got out his wallet and showed us all of the money that he had in his wallet, and said that he had a lot more where that came from.” Deanna testified that defendant “started telling us the sexual acts that he likes and the sexual acts that he likes to be done to him . [^J] ... He said that he liked for people to give him head. And when he was saying this, he kept referring to young girls. And he kept using the words young girls. He likes when—he said he liked when young girls gave him head, and he liked to have sex with young girls only when their young wet pussy was wet.”
At this juncture the girls wanted to get out of there. Megan was feeling “[ujpset to my stomach. Disgusted. That it wasn’t a joke anymore.” Defendant asked what she was going to do. She said, “Nothing.” Meanwhile Deanna “kind of looked at Megan and like gave her a nod to say let’s get the hell out of here.” Megan tried to stand up. Defendant grabbed her left arm and said, in a stem, kind-of demanding or mean voice, “You’re not going anywhere,” or “We’re not done yet.” Megan testified that the force he used wasn’t enough to hurt, “but it was to where I couldn’t really get away from him.” Deanna testified that defendant had a “really angry” and “odd” look, and that Megan looked scared and was yelling. Megan “tried to stmggle away” while Deanna pulled her right arm and defendant pulled her left. Both girls described it as a “tug of war.”
When Deanna realized what defendant was doing, she looked over toward their friends on the grass, and probably said or yelled something to them. One of the boys ran up, opened the door behind the driver’s seat, and grabbed defendant around the neck. The same boy either punched defendant, or held him in a headlock while another boy hit him.
By this time defendant had let go of Megan’s arm. Deanna pulled Megan from the car and the two of them ran to the fire station, where the boys caught up with them. One of the boys had grabbed defendant’s wallet. Megan said the four youths divided the money from the wallet among them. She also took a phone card, which she later gave to police. Deanna denied taking any cash but admitted taking the wallet itself, with defendant’s driver’s license and credit cards. She made purchases with some of the cards. She ultimately turned the wallet and its contents in to the police.
Deanna testified that when defendant offered money for sex, the offer seemed to be directed to her as well as to Megan. She thought defendant “was speaking to both of us.”

*1378
Autumn

The jury convicted defendant of solicitation to join in the commission of lewd acts upon a child (§ 653f, subd. (c)), and misdemeanor annoying or molesting of a child (§ 647.6) in connection with his conduct toward Autumn.
Autumn testified that in April 1998 she was 14 years old. At that time a man would often call the phone in front of the general store in Bodega, where kids hung out after school. He did not call every day, but on days he did call, he called repeatedly. On April 27 she answered that phone. The caller was a man with a “crackly voice” and an occasional stutter. He sounded 50 or 60. He asked for “Sarah,” saying she had paged him. He said his name was “Shawn Ryeback (phonetic).” He gave a Sebastopol phone number and a Rincon Valley address, and claimed to be in his 20’s.
Autumn spoke to this man three times that day. On the first and second calls there was “discussion of sexual acts.” “He would try and get you to meet him someplace, go to his house, or just meet him in a certain place that was kind of in a public area, but kind of secluded from other people. And he would proceed to try and get you to talk dirty, like tell you what you would—tell you what he would do to you, and like try and get you to say things that you might do to him.” By “do things” she meant “[sjexual things.” In his second call he tried to get her to meet him someplace. In the third call she “just told him that he was gross and he shouldn’t call there anymore,” and hung up on him.
In that same month Autumn received an obscene phone call at a pay phone by the gym in her high school. She recognized the voice right away as “the person calling the Bodega pay phone.” Again he asked for a girl named Sarah. She said that there was no one around but her, that she was testifying against him, and that if he called again she would call the Sebastopol police.

Other Proceedings

In addition to the counts described above, the jury convicted defendant of misdemeanor annoying and molesting of a child (§ 647.6, subd. (a)) with respect to Audrey, Robin, and Jessica.[6] These counts are not implicated by any of defendant’s arguments and the facts presumptively found in support of them therefore need not be recapitulated.
The jury also convicted defendant of attempting to solicit another to commit or join in commission of a lewd act upon a child (§§ 664, 653f, *1379 subd. (c)). The named victim was Fran Conner, the wife of a police officer who masqueraded as the teenage “Jennifer” in recorded telephone conversations with defendant. Again, the underlying facts appear irrelevant to any issue on appeal and are therefore not recounted here.
The court sentenced defendant to an indeterminate term on the charges involving Karen P., and to a total term of eight years six months on the remaining charges. This appeal followed.
Discussion
I.

Solicitation to Violate Section 288

Defendant contends that his conduct in soliciting minors to engage in lewd conduct with him did not constitute a violation of section 653f, subdivision (c) (section 653f(c)), which makes it a crime to “solicit[] another to commit. . . any violation of Section . . . 288.” Defendant contends that asking a minor to engage in lewd conduct with the person making the request does not fall within the plain meaning of the statute because the minor would not, by acceding to the request, violate section 288. We are compelled to agree.
On the facts here, none of the children importuned by defendant would have “committed” a violation of section 288 had they succumbed to his importunities. Section 288 punishes one who “willfully and lewdly commits any lewd or lascivious act . . . upon or with the body ... of a child.” (§ 288, subd. (a) [applicable when child is under 14]; see § 288, subd. (c)(1) [penalizing “an act described in subdivision (a)” where “the victim is a child of 14 or 15 years” and perpetrator “is at least 10 years older than the child”].) We are satisfied that a minor does not violate section 288 by engaging in lewd conduct with an adult. Although we have found no perfectly square holding to this effect, such a conclusion flows inexorably from at least two distinct principles. The first is that the “gist” of a section 288 violation is an act “upon or with” the body of a child and a child who engages in lewd conduct with an adult commits no such act.[7] (See People v. Slaughter (1941) 45 Cal.App.2d 724, 725 [115 P.2d 30] [minor victim of alleged § 288 violation not an accomplice whose testimony had to be corroborated to support conviction, because gist of offense was commission *1380 of lewd acts upon body of a child and child engaged in no such acts]; People v. Hulbart (1921) 55 Cal.App. 112, 113-114 [202 P. 939] [to same effect]; People v. Troutman (1921) 187 Cal. 313, 317-318 [201 P. 928] [same: “ ‘the minor is guilty of no legal offense, regardless of his mental capacity or moral insight and regardless of his acquiescence. . . . [T]he gist of that offense is that the act is committed with one under the age of fourteen years.’ ”].)
The second principle is that a minor cannot violate section 288 by engaging in lewd conduct with an adult because the minor belongs to the class of victims whom the statute was enacted to protect. In People v. Tobias (2001) 25 Cal.4th 327, 332 [106 Cal.Rptr.2d 80, 21 P.3d 758], the Supreme Court held that a minor participant in acts of incest could not be guilty of that offense, and could not be viewed as an accomplice, by virtue of the “ ‘settled’ ” rule that “ ‘where a penal statute expressly outlaws conduct against minors, a minor who is a victim of the proscribed conduct is not an accomplice and the jury need not be instructed that the minor’s testimony requires corroboration.’ ” (Id. at p. 334, quoting People v. Mena (1988) 206 Cal.App.3d 420, 425 [254 Cal.Rptr. 10], italics omitted.)
 We conclude that a minor cannot violate section 288 by engaging in lewd conduct with an adult. It follows that an adult who asks a minor to join him or her in such conduct has not committed the act proscribed by section 653f(c), i.e., “soliciting] another to commit . . . a[] violation of Section . . . 288.”[8]
Respondent does not dispute that this is the apparent meaning of the statutes at issue. Respondent contends, however, that section 653f(c) must be given a broader meaning in order to carry out its supposed “purpose” and “intent.” Respondent alludes to the broad, protective application given to section 288. (See People v. Martinez (1995) 11 Cal.4th 434, 442-443 [45 Cal.Rptr.2d 905, 903 P.2d 1037].) But before we may properly consult such considerations, the statute at issue must present an occasion for judicial interpretation. “The most basic principle of statutory construction is that courts must give effect to statutes according to the ordinary import of the language used in framing them. [Citation.] ‘If the words of the
*1381 statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.’ [Citations.]” (People v. Morris (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in In re Sassounian (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Put another way, the ascertainment of legislative intent must “begin with the language of the statute itself. [Citation.] That is, we look first to the words the Legislature used, giving them their usual and ordinary meaning. [Citation.] ‘If there is no ambiguity in the language of the statute, “then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.” ’ [Citation.]” (People v. Superior Court (Zamudio) (2000) 23 Cal.4th 183, 192 [96 Cal.Rptr.2d 463, 999 P.2d 686]; see Morse v. Municipal Court (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46] [in the absence of “ambiguity, uncertainty, or doubt about the meaning of the statute,” provision “is to be applied according to its terms without further judicial construction.”]; Arnett v. Dal Cielo (1996) 14 Cal.4th 4, 24 [56 Cal.Rptr.2d 706, 923 P.2d 1] [“In determining legislative intent, courts look first to the words of the statute itself; if those words have a well-established meaning . . . there is no need for construction and courts should not indulge in it.”].)
Obviously we must make a studied inquiry into statutory purpose where a statute’s apparent meaning is ambiguous, obscure, or so improbable as to be fairly characterized as absurd. (See Zamudio, supra, 23 Cal.4th at pp. 192-193; People v. Gonzalez (1990) 51 Cal.3d 1179, 1221 [275 Cal.Rptr. 729, 800 P.2d 1159].) But section 653f(c) does not suffer any of these deficiencies. It unambiguously conditions liability on asking another to “commit” the substantive offense—here, a violation of section 288. This is not disharmonious with other laws. Rather, it is perfectly consistent with black letter law.
The essence of criminal solicitation is an attempt to induce another to commit a criminal offense.[9] (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 31, p. 237 [statutes derive from common law offense of “soliciting] a person to commit a felony”]; In re Ryan N. (2001) 92 Cal.App.4th 1359, 1377 [112 Cal.Rptr.2d 620] [“Solicitation is defined as an offer or invitation to another to commit a crime, with the intent that the crime be committed.”]; People v. Sanchez (1998) 60 Cal.App.4th 1490, 1494 *1382 [71 Cal.Rptr.2d 309] [“Solicitation is defined as an offer or invitation to another to commit a crime.”]; People v. Miley (1984) 158 Cal.App.3d 25, 33 [204 Cal.Rptr. 347] [“Solicitation consists of the asking of another to commit one of the crimes specified in Penal Code section 653f with the intent that the crime be committed.”]; Model Pen. Code, § 5.02, subd. (1) [“A person is guilty of solicitation to commit a crime if with the purpose of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission.”]; 21 Am.Jur.2d (1998) Criminal Law, § 181, pp. 257-258 [“Solicitation is an offer, request or invitation to another to commit a crime with the intent that the person solicited commit the crime.” (fns. omitted)].)
Consistent with this conception, a defendant can ordinarily be convicted under a general solicitation statute only if, had the solicitation been successful, the person solicited would have been guilty of the underlying offense. We know of no case where this condition was not met, and respondent has offered none. Instead, respondent offers authorities of little if any pertinence, such as cases holding that the crime of solicitation is complete even if the substantive crime is never completed, or indeed, if no steps toward its completion are taken, and even if completion was factually impossible. (People v. Shapiro (1959) 170 Cal.App.2d 468, 478 [338 P.2d 963]; Benson v. Superior Court of Los Angeles County (1962) 57 Cal.2d 240, 243 [18 Cal.Rptr. 516, 368 P.2d 116].) But these cases are beside the point. Each properly applies the general principles of criminal solicitation to reach one who acted in a manner calculated to induce another to commit a crime. In each case the person solicited would have been guilty of the underlying offense had he or she done what defendant asked. Here defendant did not act in a manner calculated to induce the children he solicited to commit the underlying offense. They would not have committed that offense by doing what defendant asked, even if all the circumstances were as defendant believed, hoped, and wished them to be. The acts requested were not, as to them, a crime. Their commission of the offense was impossible not because the facts prevented it, but because the law did. Therefore the principles cited, and the cases embodying them, have no discernible bearing on this case.
Respondent cites authorities to the effect that the gist of the crime of solicitation is the “asking” coupled with the intent that the underlying offense be committed. (People v. Shapiro, supra, 170 Cal.App.2d at p. 478.) Elsewhere respondent asserts that “asking a minor to engage in sex acts is as direct a form of solicitation as one could find.” But these assertions beg the *1383 dispositive question, which is what must be asked in order to commit the crime defined in section 653f(c). Under the language of the statute, and the general conception of solicitation, the person solicited must be asked to engage in conduct that would itself constitute the underlying offense. That the defendant “ask[s]” something else, however reprehensibly, is not enough. (See fn. 9, above.)
Respondent cites People v. Bell, supra, 201 Cal.App.3d 1396, as somehow supporting its position. In that case the court affirmed a conviction of solicitation to commit sexual assault where the defendant asked an undercover officer to “procure a girl six to nine years of age ... to engage in sexual intercourse and mutual oral copulation.” (Id. at p. 1398.) On appeal the defendant contended that this conduct “ ‘did not constitute a violation of Penal Code section 653(f)(c) [sic] since [he] did not solicit anyone to commit a violation of Penal Code section 288.’ ” (Ibid.) The court rejected the factual premise of this argument, because had the officer done as defendant asked, “he would have been equally guilty, as a principal, of violating section 288. (People v. Roberts (1972) 26 Cal.App.3d 385, 387-388 [103 Cal.Rptr. 25]; Pen. Code, § 31.)” (Id. at p. 1399.) The cited authorities reflect the rule that those who aid and abet the commission of a crime “are principals in any crime so committed.” (§31.) Thus Bell is not authority for imposing liability under section 653f(c) for soliciting a minor to engage in lewd acts with the solicitor. Rather, it is authority for imposing liability on one who solicits another to aid and abet in the solicitor’s commission of the underlying offense with a third person. Under the authorities cited above, a minor cannot be guilty of violating section 288, as an aider and abettor or otherwise, where the only participants are the minor and the defendant. Accordingly Bell is irrelevant, except as a further endorsement of the principle that a violation of section 653f(c) requires a solicitation to violate the underlying statute.
Respondent notes that the statute from which section 653f(c) is apparently derived penalized “ ‘soliciting] another ... to commit or join in the commission of ” enumerated offenses. (See People v. Shapiro, supra, 170 Cal.App.2d 468, 478, italics added [quoting former § 653f|.) This was not only true of the original section 653f; it remains true of the two subdivisions now preceding the provision here at issue. Subdivisions (a) and (b) of section 653f both penalize soliciting another to commit “or join in the commission of’ specified offenses. Respondent asserts that the omission of this language from section 653f(c) appears to be “merely the result of a drafting error, not an expressed legislative intent to create two classes of violators under section 653f.” Respondent offers no evidence of any “drafting error” beyond asserting that the legislative record contains no *1384 express explanation for the omission. Respondent’s argument thus implicitly urges us to insert language enlarging the reach of section 653f(c), merely because of the asserted lack of an explanation for the absence of that language.
This approach reverses a number of familiar principles—not only the plain meaning rule already cited, but also the “rule of lenity” under which legitimate doubts about the reach of a criminal statute are resolved in favor of the defendant. (See People v. Avery (2002) 27 Cal.4th 49, 57 [115 Cal.Rptr.2d 403, 38 P.3d l].)[10]
 Further, it has been explicitly recognized that “[w]hen the Legislature uses a term or phrase in one part of a statute but excludes it from another part, the courts should not imply the missing phrase into the sections from which it was excluded.” (In re Jerry M., supra, 59 Cal.App.4th 289, 297, fn. 5; see Pasadena Police Officers Assn. v. City of Pasadena (1990) 51 Cal.3d 564, 576 [273 Cal.Rptr. 584, 797 P.2d 608].) Rather, in the absence of an affirmative reason to suppose otherwise, we presume the Legislature said what it meant, meant what it said, and had a good reason for the words it chose. (See People v. Snook (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) To do otherwise is to make law by “judicial fiat.” (People v. Morris, supra, 46 Cal.3d 1, 15.)
Respondent asserts that defendant’s interpretation of the statute— i.e., application according to its plain meaning—“violates public policy” because “[i]t makes little sense to criminalize the indirect solicitation of such offenses as a felony, but impose only misdemeanor liability on one who seeks to commit the crimes himself.” We are unable to ascertain precisely what is meant by this assertion, but we reject any notion that the statute produces results so “absurd” as to warrant judicial “correction.” At its core section 653f(c) targets the conduct of bringing a third person into the zone of potential criminality otherwise occupied only by the defendant and the victim. By soliciting another person to directly perpetrate the offense, or to aid and abet its commission, the defendant threatens to inculcate criminal intent in those who would otherwise remain law abiding. This threatened communication of criminal inclinations so as to infect others and enlarge the *1385 criminal enterprise is the core evil at which criminal solicitation laws are aimed. Since the facts before us threatened no such enlargement, the Legislature could have rationally believed that they did not support the imposition of punishment under the general solicitation statute. The Legislature could rationally conclude that a defendant who ineffectually invited a minor to join him or her in lewd conduct, and whose actions did not rise to the level of an attempt (see following section), would be adequately punished under section 647.6, which prohibits annoying or molesting a child. We note that while a first conviction under that statute may be punished as a misdemeanor, any repeat offense is a felony, and if the defendant has prior convictions for other sex offenses the severity of punishment is increased accordingly. (§ 647.6, subd. (c)(1), (2).) We cannot say that the gradation of punishments reflected in this scheme is absurd or otherwise justifies judicial “correction.”
Our conclusion that the plain meaning of section 653f(c) does not reach defendant’s conduct, and that the statute must be applied according to that meaning, makes it unnecessary to consider defendant’s remaining arguments. In particular we do not consider the argument that if construed as urged by respondent, the statute would deny due process by failing to give adequate notice of the conduct proscribed.
II. Attempts to Violate Section 288
Defendant was charged with and convicted of four counts of attempting to violate section 288 based on his conduct toward Michelle, Brandi, Megan, and Deanna. He contends that these convictions cannot be sustained because his conduct did not pass beyond the preparatory stage to the actual commencement of commission of the underlying offense. He further contends that the evidence was too vague with respect to Brandi, who did not testify. We hold that given the overwhelming proof of defendant’s intent to commit the acts proscribed by section 288, the evidence sufficiently showed an attempt as to each of the four victims.
“ ‘An attempt to commit a crime consists of a specific intent to commit the crime, and a direct but ineffectual act done towards its commission. [Citation.] Commission of an element of the underlying crime other than formation of intent to do it is not necessary. [Citation.] Although mere preparation such as planning or mere intention to commit a crime is insufficient to constitute an attempt, acts which indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient. [Citations.]’ ” (People v. Jones (1999) 75 Cal.App.4th 616, 627 [89 Cal.Rptr.2d 485]; see §§ 21a [defining attempt], 664 [prescribing punishment]; People v. Toledo (2001) 26 Cal.4th 221, 230 [109 Cal.Rptr.2d 315, 26 *1386 P.3d 1051] [“When a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime [citation], and performs an act that ‘go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action’ [citation], the defendant may be convicted of criminal attempt,” quoting People v. Kipp (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169]].)
Defendant contends that the conduct shown here did not satisfy these tests. We disagree. His acts toward the four victims identified in the attempted section 288 counts “indicate [d] a certain, unambiguous intent to commit that specific crime, and, in themselves, [we]re an immediate step in the present execution of the criminal design.” (People v. Jones, supra, 75 Cal.App.4th at p. 627.)
Because defendant singles out the evidence as to Brandi for special challenge, we recount it here. Michelle testified that she spoke to defendant on February 24 when he called the pay phone at Anthony’s and she answered. Identifying himself as “Shawn,” defendant asked Michelle what she would do for $200. He made various sexual proposals and asked her if she “suck[ed] dick.” Michelle thought he also spoke to Brandi on the phone. Shortly after this telephone conversation defendant arrived at Anthony’s by car. After buying something in the store he came up to Michelle and Brandi and asked, “Are you the two girls I talked to on the phone?” They asked who he was, and he said, “Shawn.” They said they were not interested. Defendant pulled out money and held it out toward them. He invited them into his car and “wanted [them] to go with him around the corner to the park.” In making these statements, Michelle testified, he was addressing both of them.
In contending that this conduct failed to establish more than “mere preparation” defendant cites only one case squarely favorable to him: People v. La Fontaine (1978) 79 Cal.App.3d 176 [144 Cal.Rptr. 729], disapproved on another point in People v. Lopez (1998) 19 Cal.4th 282, 292 [79 Cal.Rptr.2d 195, 965 P.2d 713]. The court there reversed a conviction for attempting to violate section 288 where the defendant picked up a 13-year-old hitchhiker and, after driving a bit, stopped the car and asked the boy if he would like to make five or ten dollars by permitting the defendant to “ ‘give [him] a blow job.’ ” {People v. La Fontaine, supra, at p. 179.) The boy declined and got out of the car. The defendant never touched him or made a move as if to touch him. The Court of Appeal held that these facts failed to establish an attempt to violate section 288. ((La Fontaine, at p. 183.) The court concluded that the defendant had done nothing beyond solicitation and that “acts of solicitation constitute preparation only and do not rise to the level of the offense of a criminal attempt.” (Ibid.)
*1387 We do not believe the categorical rule adopted in La Fontaine is sound in its own right or constitutes a correct statement of California law. That an invitation to participate in the defendant’s commission of a crime consists only of words does not mean it cannot constitute an “act” toward the completion of the crime, particularly where the offense by its nature consists of or requires the requested type of participation. (See Perkins, Criminal Attempt and Related Problems (1955) 2 UCLA L.Rev. 319, 351-353.)[11] No case has actually followed La Fontaine on this point. Indeed, two courts have expressed doubts about its viability. (See People v. Ansaldo (1998) 60 Cal.App.4th 1190, 1196 [71 Cal.Rptr.2d 283] [La Fontaine holding “ha[s] not been adopted in any other published decision” and in view of later developments, “the time may be at hand for a reevaluation”]; Hatch v. Superior Court (2000) 80 Cal.App.4th 170, 188 [94 Cal.Rptr.2d 453] [rejecting defendant’s argument under La Fontaine that he did not attempt to violate § 288 because he made no effort to touch victim and that mere solicitation to commit sexual acts was insufficient; “assuming La Fontaine's analysis remains good law,” conviction was supported by evidence that defendant lewdly extended his hand toward victim].) A third court has implicitly rejected its categorical exclusion of solicitative conduct as sufficient to constitute an attempt. (People v. Delvalle (1994) 26 Cal.App.4th 869, 877 [31 Cal.Rptr.2d 725] [defendant properly convicted of attempt to buy a person despite contention that conduct was mere solicitation; reliance on La Fontaine and other cases misplaced; no one test can distinguish all preparations from attempts].)
While other cases involving attempted lewd conduct have sought to harmonize their results with La Fontaine, any approval of the rule in that case consists at most of tepid, often oblique, dictum. Thus in People v. Memro (1985) 38 Cal.3d 658, 698-699 [214 Cal.Rptr. 832, 700 P.2d 446] (Memro I) (later appeal, People v. Memro (1995) 11 Cal.4th 786, 861-862 [12 Cal.4th 783d, 47 Cal.Rptr.2d 219, 905 P.2d 1305] (Memro II)), the court merely described the holding in La Fontaine in passing, as one of the then few published cases involving attempted violations of section 288. (Memro I, supra, 38 Cal.3d at p. 698, fn. 48.) However there was no evidence in *1388 Memro I that the defendant ever solicited the participation of his minor victim or otherwise communicated his lewd intentions. He confessed only that he invited the victim to his apartment with the apparently secret intention of taking nude photographs of him, then abruptly became angry and strangled the boy when the latter announced his intent to leave. (Id. at p. 699.) The court wrote that “the simple act of accompanying [the victim] up to [the defendant’s] apartment probably fell within the ‘zone of preparation,’ ” but that the defendant “went beyond preparation” when he “ushered the boy into the bedroom to watch the strobe lights and stayed close by. These were steps which furthered his aim of readying Carl Jr. for a nude photography session which was, in all likelihood, intended to culminate in lewd conduct. These acts, therefore, constituted the ‘actual commencement of his plan’ and were sufficient to support an attempt. [Citation.] But for [the victim’s] abrupt decision to leave the apartment, it is likely that these steps would have resulted in a completed violation of section 288.” (Ibid.)
Defendant cites the case for its statement that accompanying the victim to the defendant’s home “probably” constituted mere preparation. But this dictum has little pertinence here, because the conduct described was far more equivocal than the conduct in the present case, which involved direct invitations and inducements to immediately engage in lewd conduct. Indeed it is impossible to tell from the facts in Memro how, if at all, the defendant intended to carry his lewd intentions into effect. He was apparently proceeding with no clear plan. Here defendant’s plan was simple and obvious, and the only apparent impediment to its completion was the location of a willing victim.
The decision in Memro I is relevant here not for its analysis of the conduct in that case but for its emphasis on the role of evidence of criminal intent in prosecutions of this kind. The court cited a line of cases emphasizing the significance of such evidence as distinct from an exclusive focus on “the degree to which the acts go beyond ‘mere preparation.’ ” (Memro I, supra, 38 Cal.3d at p. 698.) The court endorsed earlier judicial statements that when “ ‘the design of a person to commit a crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.’ ” (Ibid., quoting People v. Fiegelman (1939) 33 Cal.App.2d 100, 105 [91 P.2d 156], italics added.) The role of this principle was reemphasized in Memro II, where the court noted that overwhelming evidence had established the defendant’s intent to commit the completed offense: “In addition to the assortment of magazines and photographs suggesting defendant’s sexual interest in youths, the jury also had *1389 before it the confession in which he described wanting to photograph [the victim] and wanting to have sex with [another] 12-year-old [victim] before killing him in 1976. From this evidence, a rational jury could infer that he planned to act on his sexual interest in young boys by performing a lewd or lascivious act with [the victim].” (Memro II, supra, 11 Cal.4th at p. 862.)
In Memro I the Supreme Court noted that it had recently endorsed such an emphasis on criminal intent in People v. Dillon (1983) 34 Cal.3d 441, 455 [194 Cal.Rptr. 390, 668 P.2d 697]. (Memro I, supra, 38 Cal.3d at p. 699.) There a capital defendant contended that, at least where an attempt was relied upon as the predicate felony for a felony-murder theory, the law should require proof “not only of intent and a direct act beyond mere preparation, but of the commission of an element of the underlying crime other than the formation of such intent,” and also should recognize a defense of “voluntary abandonment of the criminal effort, regardless of how close to consummation it had progressed.” (Dillon, supra, 34 Cal.3d at p. 453.) The Supreme Court rejected these proposals, finding that they would “frustrate [the] aim” of the law of attempts. (Ibid.) “ ‘One of the purposes of the criminal law is to protect society from those who intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime.’ [Citation.] Accordingly, the requisite overt act ‘need not be the last proximate or ultimate step towards commission of the substantive crime. . . . [f] Applying criminal culpability to acts directly moving toward commission of crime ... is an obvious safeguard to society because it makes it unnecessary for police to wait before intervening until the actor has done the substantive evil sought to be prevented. It allows such criminal conduct to be stopped or intercepted when it becomes clear what the actor’s intention is and when the acts done show that the perpetrator is actually putting his plan into action.’ [Citations.]” (Ibid., italics added.)
The Dillon court also addressed the defendant’s reliance on earlier language to the effect that to constitute an attempt, “ ‘there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter ....’” (People v. Dillon, supra, 34 Cal.3d at p. 454, quoting People v. Buffum (1953) 40 Cal.2d 709, 718 [256 P.2d 317], overruled on other grounds in People v. Morante (1999) 20 Cal.4th 403, 432 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) “Our reference to an ‘appreciable fragment of the crime’ is simply a restatement of the requirement of an overt act directed towards immediate consummation .... [0]ur reference to *1390 interruption by independent circumstances rather than the will of the offender merely clarifies the requirement that the act be unequivocal. It is obviously impossible to be certain that a person will not lose his resolve to commit the crime until he completes the last act necessary for its accomplishment. But the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized. If it is not clear from a suspect’s acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway . . . .” {People v. Dillon, supra, at pp. 454-455, italics added.)
Application of these principles here requires affirmance of the challenged convictions. Defendant’s intent was far more compellingly shown than that of the defendant in Memro. It was apparent not only from his words and conduct toward the four victims of the attempt charges but also from evidence of a.Jqng history of pedophilic interests and conduct.[12] The jury heard considerable evidence that in the late 1960’s defendant molested both of his stepdaughters, Karen P. and Kathy H. He also masturbated in their presence on a daily basis, spied on them while they bathed, exposed himself to other girls riding horses near his house, and kept books with pedophilic themes. Defendant’s ex-wife testified that “[m]any, many times” between the early 1970’s and their separation in 1997, she overheard phone conversations of a, sqxual nature between defendant and young girls. She testified concerning two occasions when circumstances suggested that defendant was actually meeting with young girls.
Nor was defendant’s actual conduct equivocal on the two occasions embraced by the charges. If defendant had merely telephoned victims and proposed lewd conduct at some indefinite time and place, it would have been possible to cqnstrue his conduct as that of an “obscene phone caller” who derives all'the gratification he seeks from the call itself and who therefore contemplates no physical encounter with the victim. But when a caller follows up lewd telephonic propositions by acting deliberately to meet his victims in person, whereupon he offers incentives to participate in the suggested acts and proposes that they immediately accompany him to a place where such acts may presumably take place, a rational person could easily conclude beyond a reasonable doubt that “a crime [was] about to be committed absent an intervening force.” (People v. Dillon, supra, 34 Cal.3d at p. 455.) The intervening force in this instance was the girls’ refusal to accompany defendant. But that merely rendered defendant’s conduct ineffectual. *1391 The evidence supports a finding that an attempt was underway, and that but for the girls’ refusals, violations of section 288 would have immediately ensued.
As with Memro, defendant cites People v. Reed (1996) 53 Cal.App.4th 389 [61 Cal.Rptr.2d 658], not for its actual holding but for a dictum concerning the moment at which the defendant’s conduct ripened into a culpable attempt. In that case sheriff’s deputies, acting on a suspicious advertisement, engaged the defendant in correspondence purportedly with a mother seeking the sexual “education” of her minor daughters. The defendant agreed to meet the “mother” at a motel. He arrived bearing “sex toys,” and after reaffirming his readiness to meet the girls, entered the room where they were supposedly waiting, whereupon he was arrested. (Id. at p. 395.) On appeal he contended that his acts constituted mere preparation. Not surprisingly, the court rejected that contention. Defendant cites the court’s statements that the defendant’s “walking with the undercover deputy into the room . . . was clearly a step beyond mere preparation for the crime,” and that “this was-an uneqüívocal first act in carrying out the intended crime.” (Id. at p. 399.) These dicta hardly represent considered support for defendant’s position here. The court had no occasion to determine the exact moment at which the defendant’s conduct ripened into an attempt. It seems to us that his act of stepping into the room, far from being the “first” act in execution of a criminal plan, was very nearly the last act necessary to the completion of the crime. Indeed, since the intended victims did not exist, it is difficult to imagine what further step was possible. We doubt very seriously that the court would have reached a different result if the defendant had been arrested before stepping into the room. In our opinion he could have been convicted of an attempt upon his arrival at the motel—which is the moment at which a reasonable juror could conclude that his conduct unequivocally confirmed his criminal intentions by demonstrating that his correspondence with the “mother” was not a mere “fantasy” but reflected a concrete criminal plan he fully intended to carry out.
Defendant also cites People v. Ansaldo, supra, 60 Cal.App.4th 1190, 1197, apparently to suggest a sort of reverse inference that since the evidence of an attempt there was so unequivocal, the evidence here was insufficient. Indeed the evidence there was overwhelming, and was only made to seem otherwise because the minor victim reported that the defendant asked if she would be willing to have sex at some point in the future. The victim in question was one of three whom the defendant simultaneously brought to his house and offered money for sex. He succeeded in committing lewd acts with the other two victims, offered all three methamphetamine, and made a frightening statement (that he could cut someone’s throat and not care). The court held *1392 this evidence sufficient: “There can be no doubt, based on Ansaldo’s strikingly similar methods of operation involving all three victims, that his intent to commit lewd and lascivious acts on the second victim was clearly shown. As Memro holds, in such a case, slight acts done in furtherance are all that is necessary. Ansaldo’s attempt to have the second victim ingest drugs, his comment, which frightened her, and his offer of money for sex went beyond mere preparation. The fact that she interpreted his request to be for sex at some future point is not determinative. The jury was free to infer that had she, like her sister, agreed to his request, Ansaldo would have proceeded, at that moment, with the lewd and lascivious acts, just as he had with the other two victims.” (Id. at p. 1197.)
Similarly the jury was entitled to find here that had any of the four victims agreed to defendant’s proposals, he “would have proceeded, at that moment, with the lewd and lascivious acts,” subject only to the possible necessity of moving to a more secluded place. The evidence suggested several such places which defendant himself had mentioned to the girls. Subject only to the necessity of getting to one of them, the evidence amply supported a finding that defendant was prepared to, and had embarked upon a plan to, “immediately” commit a violation of section 288 with each and any of the girls who agreed to do so.
Defendant also suggests that he could not commit an “appreciable fragment” of the offense until he found a “willing victim.” This is the kind of categorical suggestion properly repudiated in the cases we have discussed. There may be cases, such as People v. Reed, supra, 53 Cal.App.4th 389, where a “willing victim” appears very early in the course of the contemplated crime. In such a case, the mere appearance of such a victim may be insufficient to establish an attempt. In another case—such as this one— securing a victim may be a much more advanced part of the plan. The precedent steps here included finding locations where children congregated near pay phones, finding the numbers for those phones, and trolling those numbers for potential victims. Each of the incidents charged as an attempt here progressed through these steps to the stage of trying to convert prospective victims into “willing” ones. That defendant failed to do so did not render his conduct equivocal. The evidence amply established that had he succeeded, he would have immediately proceeded to complete the crime.
We hold that the four counts charging attempted violations of section 288 were supported by sufficient evidence.
*1393 III.-V.*
The judgment is reversed on counts 1, 2, 6, 7, and 15, and the matter is remanded with directions to dismiss those charges and resentence defendant. In all other respects the judgment is affirmed.
Kay, P. J., and Reardon, J., concurred.

 Except as otherwise indicated, all further statutory references are to the Penal Code.

 Although some of the counts initially specified a one-year period, they were all amended at trial to echo count 19, which alleged that the offense took place “on or about the 1st day of January, 1969, through the 31st day of December, 1972.”

 Michelle was somewhat uncertain on this point at trial, but she so reported to a detective immediately after the incident.

 Michelle expressed uncertainty as to whether this was the same occasion: “I’m pretty sure that was the same time, because I saw him another time after that, but I don’t remember.”

 Deanna did not credit these statements: “[I]f an old perverted man is telling you he’s rich and he’s going to give you all this money, I just didn’t believe him.” She noted that defendant didn’t have a fancy car, and “if he was that rich, he wouldn’t call pay phones for young girls.” She only believed he had money when he opened his wallet and showed it to them.

 This latter name is variously spelled throughout the record. In the interest of privacy we have adopted the most common of the various spellings.

 It is true that the child might commit lewd acts upon his or her own body, but section 288 has never been understood to extend to such conduct, which would make juvenile masturbation not only a crime, but also a felony.

 A minor may violate a statute of this kind by engaging in the proscribed conduct against another minor. (People v. Tobias, supra, 25 Cal.4th at p. 334; see In re Jerry M. (1997) 59 Cal.App.4th 289, 295-296 [69 Cal.Rptr.2d 148], and cases cited [11 year old could violate § 288 by touching breasts of 12- and 13-year-old girls if he did so with requisite intent].) Soliciting a minor to commit such a violation would support a conviction under section 653f(c). A prosecution would also lie against one who solicits a minor to aid and abet the solicitor’s perpetration of the crime against another minor. (See People v. Bell (1988) 201 Cal.App.3d 1396 [248 Cal.Rptr. 57] [§ 653f(c) conviction affirmed where defendant solicited adult to procure victims for defendant].)

 Of course the term “solicitation” is not inherently limited to invitations to commit a crime. The Legislature could presumably enact a statute proscribing the solicitation of specified acts, regardless whether they would themselves be criminal. Most obviously, the Legislature could make it a distinct crime for an adult to solicit lewd conduct by a child. We hold only that it has not done so in section 653f(c).

 To be sure, the rule of lenity “ ‘is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e.,. . . resolution of the statute’s ambiguities in a convincing manner is impracticable.’ ” (People v. Avery, supra, 27 Cal.4th at p. 58, quoting People v. Jones (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165].) “[A]n appellate court should not strain to interpret a penal statute in defendant’s favor if it can fairly discern a contrary legislative intent.” (Avery, at p. 58.) The rule thus appears inapplicable here, but not because we must strain to construe the statute in defendant’s favor. Rather, the statute has one plain meaning favorable to defendant, while respondent asserts a broader, entirely inexplicit meaning. If we should not “strain” to construe a statute in defendant’s favor, we certainly will not “strain” to turn the concept of lenity on its head.

 The cited article was noted in La Fontaine for its suggestion, as paraphrased by the court, that solicitation can constitute an attempt where the solicitor intends to take an active part in the crime, the crime is to be committed at the time of the solicitation, and the cooperation of the person solicited is an essential feature of the crime itself. (People v. La Fontaine, supra, 79 Cal.App.3d at p. 182.) The court rejected this “exception” to the supposed “general principles” under which, the court apparently believed, acts of solicitation were ipso facto “mere preparation.” (Ibid.) While we do not necessarily endorse the formula thus rejected, we certainly think that the three factors identified by it are strongly indicative that a solicitation goes beyond mere preparation, i.e., constitutes a substantial step toward completion of the offense.

 The more precise term is “ephebophilia,” since defendant’s interest seems to have run more towards adolescents than preadolescents.

 See footnote, ante, page 1369.