Filed 10/13/21  P. v. Kelly CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087530 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE019449) |
| v. | |
| ANDY KARL KELLY, | |
| Defendant and Appellant. | |

A jury found defendant guilty of committing a lewd or lascivious act on a child under the age of 14 (10 counts), attempting to commit a lewd or lascivious act on a child under the age of 14, engaging in sexual intercourse or sodomy with a child 10 years old or younger (two counts), and engaging in oral copulation or sexual penetration with a child 10 years old or younger (four counts).  The victim, defendant's goddaughter, was six years old and younger at the time of the charged offenses.  Defendant was sentenced to 110 years to life and an additional determinate term of 19 years.

On appeal, defendant contends that (1) the trial court abused its discretion in admitting expert testimony concerning Child Sexual Abuse Accommodation Syndrome (CSAAS), (2) CALCRIM No. 1193 allowed the jury to consider the CSAAS evidence in an improper manner, and (3) substantial evidence did not support his conviction of attempting to commit a lewd or lascivious act on a child under the age of 14.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with committing a lewd or lascivious act on a child under the age of 14 (Pen. Code, § 288, subd. (a); counts one, two, four, five, seven, eight, nine, eleven, thirteen, seventeen)[1]; attempting to commit a lewd or lascivious act on a child under the age of 14 (§§ 664, 288, subd. (a); count three); engaging in sexual intercourse or sodomy with a child 10 years old or younger (§ 288.7, subd. (a); counts six, sixteen); and engaging in oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); counts ten, twelve, fourteen, fifteen). It was further alleged that defendant engaged in substantial sexual contact with a victim under the age of 14 years old within the meaning of section 1203.066, subdivision (a)(8). The incidents were alleged to have occurred between February 11, 2015, and July 18, 2017.

### Prosecution Evidence

**Trial Testimony About the Underlying Events**

The victim was seven years old at trial. She had a sister, S.D., who was 11, and three brothers. Defendant was the victim's godfather. The victim spent a great deal of time with her godparents, defendant and his wife, who helped the victim's father and stepmother and were essentially an extended family. The victim stayed with defendant and his wife off and on her whole life until she was six. K.S. and, more recently, A.H.,

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

defendant's daughters, also lived with them at defendant's house.[2] The victim had a small bed in defendant's bedroom next to the bed defendant shared with his wife.

The victim testified that she was five and six when bad things happened to her. On one occasion, when she was six, she was in bed and defendant was tickling her. Defendant licked her armpit and then asked her what she wanted to lick. The victim licked defendant's stomach, and then defendant pulled out his "wiener" or "thingy."

On another occasion, when the victim was five years old, she was playing outside with her friends and then went inside. Defendant came in the bedroom. Defendant pulled his penis out of his pants and "started grabbing on it for a minute . . . ." Defendant told the victim to touch his penis, and so she touched it with her finger. Eventually, "the white stuff came out." Defendant told the victim to eat it. The victim had to suck defendant's penis with her mouth. Defendant also put his penis in her vagina.

On another occasion, she was in the bathtub when defendant came into the bathroom. Defendant put his penis in her vagina. Defendant also put his fingers in her anus and put his mouth on her breasts.

Defendant also kissed the victim "like a grown-up kiss" by putting his lips on hers and putting his tongue in her mouth.

The victim testified that defendant told her not to tell anyone about the things he did with her. She did not tell her parents about the incidents because she was too frightened.

Eventually, the victim told S.D. S.D. wanted to tell her mother and encouraged the victim to tell someone, but the victim refused, saying that defendant told her she would get hurt if she told anyone. On the last occasion, the victim reported abuse to S.D., and

---

[2] K.S. was defendant's stepdaughter and A.H. was her sister.

3

then they told the victim's "cousin."[3]  S.D. and the cousin told the victim's parents.  The victim's father and stepmother took the victim to a hospital.

On cross-examination, the victim testified that she got in trouble before for watching videos she was not supposed to watch.  She denied ever watching videos of adults having sex.  However, she further testified on recross-examination that she got in trouble for watching "nasty" videos.

**The Victim's Hospital Visit, Law Enforcement Interview, and BEAR Clinic Examination**

An emergency room nurse testified that the victim "was very matter of fact."  The nurse acknowledged on cross-examination that the victim did not seem upset, was not crying, and did not provide many details of the alleged sexual abuse.

Sacramento Sheriff's Detectives Christopher Robertson and his partner interviewed the victim at the hospital.  An audio recording of the interview was played for the jury.  In the interview, the victim told the deputies that, the day before the interview, defendant made her "lick the . . . white stuff off him."  The victim was naked in the bathtub.  Defendant said to the victim that it was "take out time."  The victim put on a towel and went into the room she shared with defendant and his wife.  Defendant was rubbing his penis over his pants, and then he pulled it out.  Defendant made the victim touch his penis with her hand and suck his penis.  Defendant rubbed his penis to "make the white stuff come out," and he forced the victim "to lick the white stuff off him."  Defendant made white stuff come out again and he made the victim eat it again.  He used his own hand to make the white stuff come out, and he put his "wiener" in her "hole."  However, "the whole wiener wouldn't fit."  Defendant placed his finger in her anus, and then put his finger in the hole in "front."  The victim said that defendant placed his penis in her hole on three separate occasions.

---

[3]  She was not actually a cousin by blood relation.

Defendant taught the victim how to "grown-up kiss" using the tongue. That occurred on the victim's birthday when she turned six.

The victim told the deputies that she never told anyone about the incidents because she was scared. Defendant threatened her that, if she told anyone, he would spank her until she could not feel anything.

On cross-examination, Robertson confirmed that, during the interview, the victim was calm and was not crying.

Julie Langston was a registered nurse who worked for the Sutter Medical Group at the BEAR Clinic, where they perform sexual assault and child abuse forensic assault exams.[4] Langston performed an exam on the victim on July 20, 2017. Langston testified that symptoms the victim had disclosed included abdominal and pelvic pain, "pain when she went to the bathroom with some genital itching," and bleeding when she had a bowel movement. Langston noted that the victim "had a yeast infection a couple months earlier and there had been some genital itching with that." Langston testified that abdominal or pelvic pain, pain on urination, and yeast infections can be side effects of vaginal sexual assault, but there is no way to directly link such symptoms to a vaginal sexual assault. Langston also testified that yeast infections can have nonsexual causes.

Langston testified that, in examinations in cases of sexual assault, in more than 50 percent of adults and 90 percent of children, the physical exam results are "normal." In other words, it is not surprising in a case of recent sexual abuse to find no injuries. In her examination of the victim, Langston did not find anything abnormal. The victim did have a slightly dilated anus, but that could have resulted from a recent bowel movement.

---

[4] Langston testified that BEAR is an acronym for "Bridging Assessment Evidence and Resources," presumably reversing the order of "Evidence Assessment."

5

Langston testified that the lack of findings in the victim's exam was consistent with the history of sexual abuse described to Langston.[5]

Later, Detective Shane Spence went to the victim's father's and stepmother's house to discuss with them the procedure of a SAFE interview.[6]  Spence showed the victim a photograph of defendant to see if she could identify him.  The victim identified defendant, said that she missed him, and spontaneously kissed the photograph.

**The Victim's SAFE Interview**

At the SAFE interview, the victim seemed very nervous and threw up in the car on the way.  The prosecution played a recording of the SAFE interview for the jury.[7]

The victim told the interviewer that defendant was very nice, "but he started doing S-A-X," by which she meant sex.  The victim stated that defendant "started putting his thingy in" her, started having sex with her, and forced her to lick white stuff off of him.  According to the victim, this happened on three occasions.

On the first occasion, defendant tried to have sex with her.  The victim and defendant were snuggling and he licked her armpit.  He asked her what she wanted to lick, and she said his tummy.  She licked his bellybutton.  Defendant then pulled out his "wiener" under the blanket and "was squishing it," with his hands.  Defendant asked the victim to have sex and she said no.  The victim and defendant were "talking backwards," "no means yes and yes me [*sic*] no," and the victim said no.  Defendant said, "[h]ow about I, I have it with your doll."  Defendant started pushing on the vagina area of the

---

[5]  Langston took a number of swabs from the victim, including genital swabs, anal swabs, a buccal swab, a perioral swab from the area around the lips, and swabs around her breasts.  Langston also collected the victim's shorts, top, and underwear.

[6]  SAFE is an acronym standing for "special assault forensic evaluation."  (*People v. Sanchez* (2016) 246 Cal.App.4th 167, 174.)

[7]  Page two of the transcript of this interview is absent from the clerk's transcript.

victim's doll like he was having sex. Defendant told the victim not to tell anyone that he showed her how to have sex.

The second occasion occurred on the victim's birthday. Defendant told the victim to give him a kiss, and "then he went to the tongue." He made her put her tongue inside of his mouth and he put his tongue inside her mouth. Defendant's hands were on the victim's neck. He then received a work-related phone call and had to leave.

On the most recent occasion, when the victim was six, she was outside playing with friends. The victim had to go inside because her toe was bleeding. Defendant prepared a bath for the victim. When she went to the bath, the victim had a bathing suit on, and she asked defendant to leave so she could take it off. Defendant watched her through a crack in the door. The victim got into the bathtub and defendant came back into the bathroom. He was wearing black shorts and he took them off. Defendant sucked on the victim's "boob." Defendant laid down and pushed down on the victim's vagina with his "thingy" or his "wiener." Defendant's penis went inside of the victim's vagina. Defendant was moving and shaking. At one point, defendant's face started turning purple and had to get up and get his shot from the refrigerator. Defendant was diabetic. The victim followed defendant and saw him get his shot from the refrigerator and give himself the shot. On this occasion, according to the victim, defendant injected the shot on his "thingy." Defendant put his finger inside the victim's vagina and "rolled it around in there . . . ." He also put his finger in her anus. Defendant and the victim went to the bedroom. Defendant told the victim to "[s]queeze [his] wiener. Squeeze it really fast." Defendant made the victim "suck the top" of his penis. The white stuff came out of defendant's penis. The victim had to lick the white stuff off of defendant's "wiener" and "the balls." Then, as defendant's wife came in, defendant told the victim to get back into the bath. The victim was scared because defendant told her that, if she told anyone, he would spank her until she could not feel anything. After defendant's wife went back to

work later, the victim was in bed and she woke up. Defendant took off the black shorts and put his penis in her vagina again.

**DNA and Urological Evidence**

Ryan Nickel testified as an expert in DNA analysis and statistical significance. Nickel analyzed a number of samples including defendant's reference sample and items in the victim's BEAR collection kit. On one of three vestibule swabs, he detected "one sperm head in a screening cutting."[8] Nickel found two sperm heads on the underwear in the BEAR kit and took a cutting for DNA analysis.

Nickel developed DNA profiles from the items he found. No foreign DNA was found on the vestibule swab.[9] On cross-examination, Nickel agreed that it was it was a misnomer to discuss the sperm fraction on the vestibule swab because, after DNA analysis, no sperm was found.

On the sperm fraction Nickel located on the underwear, he found a mixed profile, with one female contributor and one male contributor. Defendant was a potential contributor to the male profile in the sperm fraction. According to Nickel, it was 16.1 quadrillion times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. As to the nonsperm fraction, Nickel also discovered a mixed profile, one male and one female. According to Nickel, it was 33,800 times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. Nickel testified that, if he did not have to dilute the

---

[8] Langston testified that the vestibule is the area "right after the labia minora, right before the hymen."

[9] Nickel explained that it is possible to find no foreign DNA in a swab taken from a female despite the presence of a sperm fraction because "either there just isn't enough -- there aren't sperm cells on that remaining three-quarters sample that I took to DNA or that the epithelial cell fraction is overwhelming the number of the sperm cells and ending up in the sperm fraction."

sample before amplifying it in order to properly perform his analysis, the "profile would be a lot higher."

Nickel testified that articles furnished by the defense supported the premise that transfer of DNA in the washing machine can occur. However, Nickel testified that the DNA quantities found in this case were significantly higher than those found in the studies, suggesting that such transfer did not explain the presence of defendant's DNA in the underwear. On redirect, Nickel reiterated his belief that the underwear had been recently worn and had not been washed based on a stain in the underwear and epithelial cells he found in one of the cuttings. Nickel also testified that the amount of DNA detected in the nonsperm fraction from the underwear was approximately 60 nanograms, and that one of the articles provided by the defense on transfer occurring in washing machines "says if you get higher than 6.7 nanograms, then you can likely exclude secondary transfer."

Dr. Robert Lurvey testified as an expert in urology. He testified that there are three types of medication that may be injected into the penis. These medications treat erectile dysfunction. They are administered by the patient by injection in the penis using an insulin-type needle. The injection would be administered prior to sexual intercourse and would cause an erection in approximately five to ten minutes. This type of medication is stored refrigerated. Lurvey testified that a patient suffering from erectile dysfunction could have an erection, lose it prior to ejaculation, and then administer a shot to regain an erection. Lurvey also testified that erectile dysfunction is common among men who have diabetes.

### Defense Evidence

K.S. testified that she witnessed defendant interacting with the victim over several years, and she never observed anything in their interactions that seemed weird to her. She also never witnessed anything sexual in their interactions. K.S. never felt uncomfortable based on anything defendant did with her. None of K.S.'s sisters ever

9

reported anything to her about feeling uncomfortable around defendant. K.S. testified that the victim "would lie about whatever she could and try and get away with it. That was a frequent thing with her."

A.H. testified that she did not notice anything unusual in how defendant acted towards the victim when they all went on a trip to a ranch in Nevada for three days. The victim never said anything to A.H. about any adult acting inappropriately towards her, and she never said anything about defendant touching her in a sexual way. A.H. never witnessed anything in defendant's interaction with the victim that caused A.H. concern.

J.H., who was 25, had considered defendant to be her father for about 20 years. J.H. had never seen defendant act inappropriately towards a child or express a sexual interest in a child. In the time surrounding the family vacation to a ranch in Nevada, she did not see anything unusual between the victim and defendant. She testified that, at one point, she had to speak to the victim about the victim watching adult videos. According to J.H., the victim was curious about the human body and sexual things.

L.K., defendant's sister, testified that defendant was her "protector and . . . hero." L.K. testified that defendant was honest and trustworthy. She never observed any unusual behavior between defendant and his two daughters from a previous marriage. Neither of the daughters ever spoke to L.K. about defendant acting inappropriately. L.K. also testified that she did not witness any inappropriate actions by defendant towards any of the girls on a trip to Disneyland which included "the stepdaughters, biological daughters" and the victim. L.K. also did not notice anything unusual about the victim's demeanor during the three-day stay at a ranch in Nevada.

Defendant testified on his own behalf. He testified that he was diabetic. He gave himself injections twice a day in the stomach or the arm to manage his diabetes. He testified that he did not inject insulin or anything else into his penis, and that he never took any medication for erectile dysfunction.

10

Defendant did the laundry in the house.  There was a clothes hamper in his room at the foot of the bed.  Defendant testified that his clothes went in that hamper, and, if the victim was at the house, she would put her clothes in that hamper too.

Defendant denied engaging in any of the sexual acts the victim described.

## Verdicts and Sentencing

The jury found defendant guilty of all counts and found true the allegation pursuant to section 1203.066.  The trial court sentenced defendant to 110 years to life and an additional 19-years determinate.

## DISCUSSION

## I.  CSAAS Testimony and Statistical Evidence Related to False Accusations

### A.  Additional Background

#### 1.  In Limine Motion

The prosecution stated in its trial brief and motions in limine that it planned to call Dr. Blake Carmichael as an expert in the area of child sexual abuse and specifically how children react to such abuse.  The prosecution stated that this topic was encompassed within the broader subject of CSAAS, and that courts have typically admitted testimony on that subject.  The prosecution asserted that three of the misconceptions covered in CSAAS were present in this case:  delayed reporting, helplessness, and secrecy and accommodation.

In defendant's in limine motion, he sought to exclude CSAAS testimony.  He asserted that CSAAS evidence has been shown to be neither reliable nor relevant in assessing allegations that a child has been the victim of sexual abuse.  Defendant acknowledged that, since the publication of Dr. Roland Summit's article in 1983, on which CSAAS testimony is based, CSAAS had been admitted to dispel the misconception that children who had been sexually abused will report the abuse immediately.  However, he further asserted that, based on publicity about child molestation, jurors were now aware many child molestation victims "may not report the

11

incident right away or may never report them at all" and CSAAS evidence was no longer needed to dispel any misconception. Thus, according to defendant, "any such testimony is unnecessary, misleading, time consuming and will serve no purpose other than to confuse the jury and attempt to bolster the credibility of the complaining witness' testimony." Defendant also asserted that CSAAS testimony should be excluded because it was inadmissible under the *Kelly/Frye* test;[10] irrelevant; more prejudicial than probative under Evidence Code section 352; speculative; and misleading and confusing. Defendant also asserted that the introduction of this evidence would violate his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under applicable sections of the California Constitution.

### 2. Hearing and Trial Court's Ruling

The court deferred ruling on the in limine motions concerning CSAAS until after the victim testified. Following that testimony, the trial court inquired as to the prosecution's proposed focus of Carmichael's testimony. The prosecutor identified seven areas about which she would seek testimony from Carmichael: (1) incremental disclosure, (2) failure of memory, (3) why children sometimes disclose to other children rather than adults, (4) children acting as if there is not a problem and wanting to continue seeing the abuser, (5) allegations that the victim learned about sexual acts elsewhere and displaced blame on defendant, (6) helplessness and accommodation, and "[t]hat children lying and making up these types of allegations are very rare, especially when they love the person" and (7) confusion over timing and details.

---

[10] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. Defendant appropriately does not make a *Kelly/Frye* claim here. Any such claim would be meritless. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*) [CSAAS evidence is not subject to a *Kelly*/*Frye* analysis]; *People v. Munch* (2020) 52 Cal.App.5th 464, 472-473 (*Munch*) [same].)

Defense counsel acknowledged that CSAAS evidence was routinely admitted in California courts, although other jurisdictions rejected it as "junk science." Counsel also argued that misconceptions related to nondisclosure may have been prevalent years ago, but because of certain events such as the Catholic priest and Penn State scandals, jurors now recognize children might not initially disclose for a variety of reasons.

Recognizing the law allows for the admissibility of CSAAS evidence, the court asked, "So you're wanting me to enact new law, essentially pave a new way. Is that what you are saying?" Defense counsel responded: "Absolutely. I think this Court, in its wisdom, can consider enacting new law . . . I think this Court can make that ruling and become a trend setter."

The trial court ruled that it would allow Dr. Carmichael to testify. The court acknowledged the defense's point that some aspects of the testimony addressed matters of common knowledge which therefore do not require expert testimony and would be cumulative of what jurors already know. However, the court further stated that, "if there are some jurors that really aren't aware of some of these things, which . . . are in some points counterintuitive, then I think that is important for them to actually be able to consider and weigh."

### 3. Dr. Carmichael's Trial Testimony

Dr. Carmichael worked as a clinical psychologist in the Child Adolescent Abuse Resource Education Diagnostic and Treatment Center at the U.C. Davis Children's Hospital. Carmichael did not know the victim, had never talked to her or met her, and he knew nothing about this case.

Carmichael testified about delayed disclosure of child sexual abuse. He testified that it is uncommon for children to report sexual abuse soon after it occurs. According to Carmichael, research indicated that only 15 to 20 percent of children report abuse "quickly." Asked about the reasons children do not report quickly, Carmichael testified, "[w]e're looking at kids who are sexually abused primarily by folks they know, people

13

they trust, people they have an ongoing and a loving relationship. And so we can't look at abuse as a thing but more so in the context of that relationship." He testified that often the abuser is a person the child perceives as an authority figure, and children are taught to obey authority figures. Thus, a perpetrator may tell the child victim not to tell anyone, and, if the child does tell, the child would be disobeying the authority figure. Additionally, the child may have a good relationship with the perpetrator. "They enjoy going to movies. They might enjoy playing video games. They get special attention. So a lot of things that make a child feel good also comes from the person that is abusing them." This can make it confusing for the child and make it difficult to disclose the abuse because the child does not "want the person that they care about to get in trouble." The child may not want to disclose the abuse because the person to whom the child might report may have his or her own relationship with the abuser or might rely on the abuser to provide for the family. For example, if a child discloses to the mother, the mother could be upset and family discord could result, for which the child would feel responsible. A child may perceive the threat of this outcome and choose against disclosure. Carmichael testified that some researchers had found that the closer a child victim feels to their abuser, the longer the delay in reporting may be. Child victims also sometimes say they did not report abuse because they thought they would be in trouble. Such children feared both disobeying the abuser and making the person whom they told angry or facing the possibility that the person they tell would not believe them.

Carmichael testified that children may have a flat or numb affect when discussing abuse. "People sometimes expect a child to look sad, to say that they are angry, to have a different look about them talking about something so upsetting. And so we can't think of kids as miniadults. [*sic*] By the mere fact of them trying to distance themselves from those intense emotions and trying to keep those things at bay and then trying to maybe even appear stoic and not having the thoughts running through their brain, as they are telling about it, can cause them to look unaffected."

14

When asked if children try to forget the details of abuse, Carmichael responded, "[a]bsolutely." He testified that "one of the classic things to do [is] to try to avoid thinking about it."

Carmichael testified that abused children may not necessarily demonstrate signs of being fearful or afraid or sad about having to be in the presence of the abuser. They can still love their abuser and miss the abuser. "[I]t is not just the abuse that defines that relationship. There are other things they can enjoy with that person."

Turning to the process of disclosure, Carmichael testified that it was not common for children "to say everything that first time they talk about it." Typically, disclosure is not a "one-time event. It is more of a process, sometimes called incremental disclosure: Giving a little bit of information; seeing what the response is and then telling more details as they get more comfortable."

After discussing suggestibility with Carmichael, the prosecutor turned to the subject of false allegations of sexual abuse. Carmichael testified that "the statistics are that . . . children making false allegations of sexual abuse are rare. Anywhere between zero and 5 or 6 percent . . . of allegations are found to be false made by children." Higher rates of false allegations were found in circumstances involving custody disputes or child visitation, such as when a married couple is divorcing. However, in those cases, it was not the children, but rather one parent, making the false allegations.

On cross-examination, defense counsel referred to CSAAS, which Carmichael and the prosecutor had not done during Carmichael's direct testimony, asking if the subjects about which Carmichael testified were part of that broader subject. Carmichael acknowledged that delayed disclosure was, indeed, a subject of CSAAS. Carmichael acknowledged that CSAAS dated to Dr. Summit's 1983 article in which Summit discussed observations of hundreds of children who had been sexually abused and his "observations of some of the things the kids did that weren't expected but also the variety of ways kids can deal with being sexually abused." Carmichael testified that CSAAS did

15

not create a diagnostic tool. He testified that there "is no tool, symptom, check list. There is nothing that is in place today that can tell you if a kid was abused." Rather, CSAAS "is an educational tool to help people understand this population of kids who we know were sexually abused."

Defense counsel asked Carmichael about his direct testimony concerning false allegations: "I think the number you used was between zero to six percent. In some instances the numbers you gave were 30 to 35 percent. You find more false allegations; fair to say?" Carmichael testified that there "are some articles that I referred to that do report a higher rate of false allegations, again, within the context of custody and parents making the allegations." After discussing studies that found few or no instances of false allegations made by children themselves, Carmichael testified that "a vast majority of research since that time has shown low rates of false allegations by kids." However, Carmichael acknowledged that, while the incidence may be low, the occurrence of false allegations made by children does exist.

## B. Admissibility of CSAAS Evidence

Defendant asserts that the trial court abused its discretion in allowing Carmichael to testify about CSAAS. Defendant asserts that Carmichael's testimony was unreliable and misleading because the underlying premise of CSAAS is the assumption that the child is indeed a victim of sexual abuse. Defendant contends that there was a substantial danger that the jury would consider that testimony as supporting the victim's claims of abuse. According to defendant, "Carmichael's testimony about CSAAS, a non-diagnostic tool . . . based on the assumption the child is a victim of sexual abuse, was not the proper subject of expert evidence because his testimony amounted to acknowledging that children react differently. In other words, one cannot assume abuse based on the presence or absence of delay in reporting." Defendant asserts that, while CSAAS evidence is intended to disabuse jurors of misconceptions about child victims, the value of this testimony is outweighed by the prejudicial effect. Defendant asserts that, because

16

the issue of guilt was largely dependent on the victim's credibility, "the CSAAS evidence compromised [defendant's] due process right to a reliable jury determination of his guilt beyond a reasonable doubt." According to defendant, the error cannot be deemed harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our high court approved of the decisions of Courts of Appeal that had held that CSAAS testimony is admissible for some purposes. (*Id*. at p. 1300.) *McAlpin* was followed by *People v. Brown* (2004) 33 Cal.4th 892 (*Brown*), which upheld the use of expert testimony concerning battered women's syndrome and which expressly did so based on similar reasoning to that in *McAlpin*. (*Brown*, at pp. 905-907.) It is now well settled that CSAAS evidence is admissible for the limited purposes it was admitted for in this case. (*McAlpin*, at pp. 1300-1301; see also *Lapenias, supra*, 67 Cal.App.5th at p. 171; *Munch, supra,* 52 Cal.App.5th at p. 468; *People v. Perez* (2010) 182 Cal.App.4th 231, 243-245 (*Perez*); *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1102 (*Sandoval*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 390-394 (*Bowker*).) And courts are bound by our high court's reasoning in *McAlpin* and *Brown*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Munch, at* p. 468; *Perez*, at p. 245.) Thus, the trial court properly declined defendant's invitation to "enact new law" and become a "trend setter." The decision of a trial court to admit expert testimony on CSAAS 'will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*McAlpin,* at p. 1299.)

While CSAAS testimony is inadmissible to prove that a molestation occurred, it is nevertheless admissible as to the molestation victim's " 'credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' " (*Sandoval, supra,* 164 Cal.App.4th at p. 1001, quoting *McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) CSAAS

17

evidence has been held admissible " ' "to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior . . . ." ' " (*Sandoval*, at p. 1002, quoting *McAlpin*, at p. 1301.)  " 'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.  Where an alleged victim recants his [or her] story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings.  In the typical criminal case . . . , it is the People's burden to identify the myth or misconception the evidence is designed to rebut.' " (*Sandoval*, at p. 1002, quoting *Bowker, supra,* 203 Cal.App.3d at p. 394, fn. omitted.)

"Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation.  It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Patino, supra,* 26 Cal.App.4th at pp. 1744-1745.)  Inconsistencies in the victim's statements may also support the use of CSAAS evidence.  (*Perez, supra,* 182 Cal.App.4th at p. 245.)  Additionally, "[a]dmission of evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal.  The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility." (*Patino*, at p. 1745.)

The typical purposes for which CSAAS evidence may be admitted were at issue in this case.  Defense counsel on cross-examination elicited testimony from the victim about the fact that she still enjoyed spending time with defendant, "aside from these things," raising issues concerning the paradoxical fact that an abused child can still love their

abuser and not be sad about being in the abuser's presence. Addressing matters related to the victim's credibility in general and, inferentially, whether she had age-inappropriate sexual knowledge from sources other than defendant, defense counsel asked the victim many questions about whether she had watched adult videos. He also asked the victim about whether she had witnessed adults having sex. Also as to the victim's credibility, he asked the victim if she "ever [told S.D.] anything just to get her attention."

Defense counsel elicited testimony from S.D. that defendant and the victim got along "[p]erfectly fine," that the victim did not seem to be afraid of defendant, and that the victim and defendant had a good relationship, which implicated the counterintuitive way child victims may relate to their abusers. In response to defense counsel's cross-examination, S.D. agreed that, on the first occasion when the victim disclosed the abuse to her, the victim only said defendant "did nasty things to me with his private." This raised the issue of incremental disclosure. He asked S.D. about the fact that the victim told S.D. not to tell anyone because the victim did not want her to do so and she said defendant would hurt her. This touched on delayed disclosure. Defense counsel asked S.D. if one of the reasons she did not tell her mother about the victim's disclosure was because S.D. was not sure whether the victim was being truthful, calling into question the victim's credibility. Defense counsel further attacked the victim's credibility, asking S.D.: "[the victim] doesn't always tell the truth, does she," to which S.D. responded that she did not. Indeed, counsel pursued this tack when discussing the victim's second disclosure as well, asking S.D. if she was not sure whether the victim was telling the truth.

Also on the subject of incremental disclosure, in response to questioning by defense counsel, the emergency room nurse testified that the victim did not provide many details of the alleged sexual abuse.

Defense counsel also elicited from the emergency room nurse testimony that the victim did not seem upset and was not crying when the two spoke, and testimony from

19

Detective Robertson that, during his interview with the victim, she was calm and not crying. This testimony was relevant to child sexual abuse victims' counterintuitive flat or numb affect when discussing abuse.

All of the foregoing witnesses testified before Carmichael testified.

Thus, the victim's credibility, delay in reporting the abuse, incremental disclosure, and her demeanor when discussing the abuse, all matters to which Carmichael's testimony was relevant, were raised throughout trial and prior to Carmichael's testimony. It is beyond reasonable dispute that "the victim's credibility [was] placed in issue due to . . . paradoxical behavior." (*Patino, supra*, 26 Cal.App.4th at pp. 1744-1745.)

As discussed in more detail in part II. of the Discussion *post*, the trial court instructed the jury with CALCRIM No. 1193 on the limited purposes for which it could consider Dr. Carmichael's testimony. Regarding Carmichael's testimony, the court instructed the jury that "testimony about these matters is not evidence that the defendant committed any of the crimes charged against him." "We of course presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*).)

We conclude the trial court did not abuse its discretion in admitting the CSAAS testimony. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; accord, *Munch, supra,* 52 Cal.App.5th at p. 468; *Perez, supra*, 182 Cal.App.4th at p. 245.)

## C. Statistical Evidence Regarding False Accusations

In his reply brief, defendant cited two cases decided after the filing of his opening brief, *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), and *People v. Wilson* (2019) 33 Cal.App. 5th 55 (*Wilson*). He asserts that, under these cases, CSAAS experts should not be permitted to testify, as did Carmichael here, as to the statistical rarity of false accusations of child abuse. We requested supplemental briefing from the Attorney General, who had not had the opportunity to address *Julian* or *Wilson*, or this argument

20

generally, because it was not raised by defendant with specificity in his opening brief. We also afforded defendant the opportunity to submit a supplemental brief in reply.

### 1. Forfeiture

The Attorney General asserts that defendant forfeited this claim because he did not object to the statistical evidence related to false allegations in the trial court. We agree.

"Evidence Code section 353 provides, as relevant, 'A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*' " (*People v. Partida* (2005) 37 Cal.4th 428, 433 (*Partida*), quoting Evid. Code, § 353.)  In accordance with Evidence Code section 353, our high court has " 'consistently held that the "defendant's failure to make a timely and *specific objection*" on the ground asserted on appeal makes that ground not cognizable.' " (*Partida*, at pp. 433-434, italics added.)  "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id*. at p. 435.)

While defendant did move in limine to exclude Carmichael's CSAAS testimony, he did not object to evidence concerning the statistical rarity of false allegations in his written motion.  Defendant asserts on appeal that he did object to this evidence during the in limine hearing.  Defendant's vague comments cannot be read as an objection compliant with Evidence Code section 353.[11]  Defendant did not specifically object to

---

[11] At the part of the record defendant cites, defense counsel stated:  the court should "keep in mind that . . . [CSAAS] does not address false allegations.  Dr. [Summit] did not discuss false allegations because that wasn't the purpose of the study.  The purpose of this empirical study was to try to explain in those that have been molested and been documented, why did they observe certain behaviors.  [¶]  So in a case of false allegations, which I don't think the district attorney mentioned, she mentioned only about the point, and I want to thank her for making my arguments for me.  I suppose that saved

21

testimony concerning the statistical rarity of false allegations and state specific grounds supporting its preclusion, such as arguing that Carmichael's testimony "about the rarity of false claims of child sexual abuse exceeded the permissible limits of expert testimony" because such statistical evidence is irrelevant and invites the jury to determine a defendant's guilt based on statistical probabilities rather than on the evidence presented. (Capitalization omitted.)  And the defense was on notice the prosecution would seek to introduce such evidence because when the trial court asked the prosecutor to outline her focus as to Carmichael's testimony, among the seven points listed, she stated: helplessness and accommodation, and "[t]*hat children lying and making up these types of allegations are very rare*, especially when they love this person."  (Italics added.)

Moreover, even assuming this evidence was covered by his general in limine objection to the CSAAS evidence, defendant still failed to preserve the issue.  "The general rule is that 'when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal' [citation], although a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim."  (*People v. Brown* (2003) 31 Cal.4th 518, 547.)  Defendant did not object to the testimony at issue here when Carmichael testified at trial.  In the absence of any objection to this specific evidence, defendant has forfeited the contention.  (*Partida, supra*, 37 Cal.4th at pp. 433-434.)

In his supplemental reply brief, defendant, citing *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411, footnote 2 (*Johnson*), asserts that it is improper to apply forfeiture where the governing law at the time of trial would not have supported a

---

me time from doing it.  But, hopefully, false allegations are not part of the study.  And so the [CSAAS] does not apply in that particular instance."  We discern no specific objection relevant to defendant's present contention, or specific grounds for such, in counsel's remarks in the trial court.

decision by the trial court sustaining the objection.  There, the court concluded there had been no forfeiture of a confrontation clause objection because the "governing law at the time of the hearing afforded scant grounds for objection."  (*Ibid*.)

However, although there was a long line of authority concerning CSAAS evidence, there was no authority approving the admissibility of statistical evidence related to false allegations.  Indeed, as trial counsel aptly observed during the in limine hearing, testimony about statistics on false accusations is not part of CSAAS.  (See fn. 12, *ante*.)  It strikes us as somewhat obvious—and more than the "scant grounds" that *Johnson* spoke of—that whether false accusations had been made in other instances is irrelevant and also subject to a valid Evidence Code section 352 objection based on the danger of misleading the jury.  Certainly, given the lack of authority approving such evidence, it cannot be said that an objection on these grounds would have been futile. (See *People v. Perez* (2020) 9 Cal.5th 1, 7-8.)  Yet, a specific objection to this testimony and those grounds were not asserted.

In his supplemental reply brief, relying on *Julian, supra*, 34 Cal.App.5th at pages 887-889, defendant suggests that, if the issue is not preserved, it is because he received the constitutionally ineffective assistance of counsel, a contention we address next.  In *Julian*, the court concluded that the objection should have been made in the trial court and that trial counsel's deficient performance was prejudicial given the circumstances of that case.  (*Ibid*.)

## 2. Ineffective Assistance of Counsel

### a. Ineffective Assistance of Counsel General Principles

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v.*

23

*Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

### b. Decisional Authority Published During the Pendency of this Appeal

In *Julian*, an expert offered CSAAS testimony. (*Julian, supra*, 34 Cal.App.5th at pp. 882-883.) However, after presenting CSAAS evidence of the type commonly seen in appropriate cases, the prosecution "introduced a new issue—the statistical percentage of false allegations by child sexual abuse victims." (*Id*. at p. 883.) The expert testified that "false allegations of sexual abuse by children 'don't happen very often.' 'The range of false allegations that are known to law enforcement or [Child Protective Services] … *is about as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.' " (*Id*. at p. 885.)

In addressing the admissibility of this testimony, the *Julian* court reviewed the purposes for which CSAAS evidence is admissible and those for which it is not. (*Julian, supra*, 34 Cal.App.5th at pp. 885-886.) Discussing the latter, the court stated: "Nor is it proper for an expert to present 'predictive conclusions' [citation], such as alleged child

24

abuse victims 'should be believed' or 'abused children give inconsistent accounts and are credible nonetheless' [citation]. Such predictive conclusions go beyond the scope of CSAAS evidence and may confuse the jury. '[T]he jurors' education and training may not have sensitized them to the dangers of drawing predictive conclusions.' [Citation.] Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence." (*Id*. at p. 886.) The *Julian* court concluded: "Here the jury had to decide between the credibility of child 2's testimony and Julian's. But [the expert's] 92 to 99 percent probability evidence invited jurors to presume Julian was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case. [Citation.] [The expert's] statistics were not admissible as CSAAS evidence." (*Ibid*.) The court further concluded that the "statistical probability evidence deprived Julian of his right to a fair trial." (*Ibid*.)

In *Wilson*, the same expert who testified in *Julian* testified that false allegations of child sexual abuse "occur 'very infrequently or rarely,' most often during a child custody dispute." (*Wilson, supra*, 33 Cal.App.5th at p. 568.) "He continued, 'There are a number of studies that talk about the pressures put on children to make a false allegation.' He referred to a 'classic' Canadian study that found 'about 4% of cases in which there was an allegation that was determined to be false,' remarking that '[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else,' such as a parent disputing custody." (*Ibid*.) On cross-examination, the expert testified that "there were 12 to 15 other studies on the subject, which found false allegations in between 1 and 6 percent of cases. Although the 'classic' study found *no* children making false allegations of sexual abuse, he concluded that 'it's better to say that false allegations do happen, because they do happen, but they happen very infrequently and rarely … .' He agreed it was possible for children to have false memories, but there was no data indicating false memories happened frequently. And, in

25

his own career, [the expert] had come across two cases in which a child alleged sexual abuse that he believed did not occur." (*Ibid*.) The defendant asserted that this evidence "improperly amounted to testimony that 96 percent (or between 94 and 99 percent) of children accusing a person of child molestation were telling the truth, and that this invaded the province of the jury in assessing a complaining witness's credibility." (*Ibid*.)

The *Wilson* court ultimately concluded: "it appears that the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible. We find the reasoning of these cases compelling. [The expert's] testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although [the expert's] testimony on this point was not expressly directed to either [a prior victim or the current victim], the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' " (*Wilson, supra*, 33 Cal.App.5th at p. 570.) The court stated: "Even assuming one could determine that only 1 to 6 percent of sexual abuse allegations are false, that fact would not be helpful to the jury because it tells the jury nothing about whether *this particular allegation* is false. Are [the past and current victims here] in the 4 percent or in the 96 percent? The jury must evaluate their testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt." (*Id*. at p. 571.) Accordingly, the court determined that the admission of this evidence constituted an abuse of discretion. (*Ibid*.)

After the parties filed the supplemental briefing we requested, Division 3 of the Fourth District concluded that Carmichael's testimony in another case concerning the rarity of false allegations was inadmissible. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179 [concluding that Carmichael's testimony "violated the general rule that an expert may not

26

give an opinion as to whether another witness is telling the truth or the defendant is guilty"].)  On appeal in *Lapenias*, the People attempted to distinguish *Julian* and *Wilson* on the ground that those cases held a CSAAS expert should not testify about the statistical frequency of false accusations, whereas Carmichael testified only as to the rarity of false allegations.  (*Id.* at pp. 179-180.)  The *Lapenias* court rejected the argument, concluding there is no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations.  (*Ibid.*)

### c. Analysis

Here, Carmichael testified that "the statistics are that . . . children making false allegations of sexual abuse are rare.  Anywhere between zero and 5 or 6 percent . . . of allegations are found to be false made by children."  Higher rates of false allegations were found in circumstances involving custody disputes or child visitation, such as when a married couple is divorcing.  However, in those cases, it was not the children, but rather a parent, making the false allegations.  Carmichael testified that false allegations of sexual abuse do occur, but it is rare for children to make those allegations.

Based on the analyses in *Julian, supra*, 34 Cal.App.5th 878, *Wilson, supra*, 33 Cal.App.5th 559, and *Lapenias*, *supra*, 67 Cal.App.5th 169, we conclude that Carmichael's testimony here was inadmissible.[12]  We will proceed directly to a discussion of prejudice.  (See generally *Strickland, supra*, 466 U.S. at p. 697.)

---

[12] The Attorney General concedes that "the admission of such testimony was error," but further asserts that if we conclude there was no forfeiture and reach the merits, the error was harmless.  The erroneous admission of expert testimony only warrants reversal if it meets the *Watson* test.  (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [finding the error harmless applying *Watson* and rejecting application of the standard in *Chapman, supra*, 386 U.S. at p. 24].)  The standard for prejudice applied in reviewing state evidentiary error under *Watson, supra,* 46 Cal.2d 818, is essentially the same as that required for the prejudice prong of the ineffective assistance of counsel test.  (*People v. Yor Xiong* (2020)

27

In addressing the prejudice prong of the defendant's ineffective assistance of counsel claim in *Julian*, the appellate court stated, in part: "The evidence . . . was highly prejudicial because this case was a credibility dispute between child 2's testimony and Julian's. *It was a heavily contested case with strong defense evidence.* Julian denied child 2's claims. He said he cooperated with police because he had nothing to hide. [A detective] confirmed that he had cooperated." (*Julian, supra*, 34 Cal.App.5th at p. 888, italics added.) The court further stated: "Child 2 had difficulty remembering certain facts, gave some tentative responses, and some of her testimony was introduced with leading questions. The conflicts between child 2's trial testimony and a CAIT[13] interview raised credibility issues. During closing argument, the People conceded that child 2's CAIT interviews 'were *very different* from her testimony' and there were 'some *serious inconsistencies*.' " (*Ibid.*) The *Julian* court then considered the effect of the expert's statistical testimony, stating: "[the expert's] statistical evidence tipped the scales in favor of the People based on statistical studies that were irrelevant to the issue of Julian's guilt or innocence. It distracted the jury from its duty to decide the properly admitted evidence. [Citation.] *Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it.* [¶] Julian's counsel cross-examined [the expert]. But [the expert] used that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused. His counsel's questions about multiple studies only opened the door *to a mountain of prejudicial statistical data* that fortified the prosecutor's claim about a statistical certainty that defendants are guilty. [Citation.] [¶] Moreover, in closing argument, the prosecutor

---

54 Cal.App.5th 1046, 1068, fn. 11; *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.)] Thus, our conclusion would be the same whether we were to analyze prejudice under *Watson* or *Strickland*.

[13] CAIT is an acronym for "child abuse interdisciplinary team." (*Julian, supra*, 34 Cal.App.5th at p. 881.)

asked the jury to rely on [the expert's] statistical evidence that 'children rarely falsify allegations of sexual abuse.' He reminded jurors that [the expert] 'quoted a Canadian study for over 700 cases, *not a single one where there was a false allegation*.' . . . The claim that there is a zero percent chance children will fabricate abuse claims replaced the presumption of innocence with a presumption of guilt. [¶] In his closing argument, Julian's counsel discussed his position regarding [the expert's] testimony about the '12 studies,' the Canadian study, the Trocme & Bala study, a social worker study showing 'four percent or five percent' as false allegations, and the prosecutor's claim that 'false allegations are very rare.' When he discussed the statistical percentage of false allegations in a study called 'false allegations of sexual abuse of children and adolescents,' the prosecutor objected. The court stopped the argument for a 15-minute recess. When the jury returned, the court instructed jurors that there was 'a disagreement' by counsel about 'a certain study.' The jury should decide the issue based on the evidence introduced about the study, not what the lawyers remember about it. Consequently, the jurors' attention was directed, once again, to the statistical study evidence right before they began their deliberations. [¶] But the jury's duty to decide the facts does not include considering inadmissible statistical information [citation] or using studies of statistical odds to determine guilt. [Citations.] Julian did not receive a fair trial." (*Julian, supra*, 34 Cal.App.5th at pp. 888-889, some italics added.)

*Julian* is in stark contrast to the instant case. Here, the victim's interviews were not " '*very different* from her testimony' " and there were no " '*serious inconsistencies*' " among the two. (*Julian, supra*, 34 Cal.App.5th at p. 888.) The victim's accounts of abuse included descriptions of actions and circumstances not typically within the experience of a child her age. The victim had recently had abdominal pain and pelvic pain and a yeast infection, which, although there could be natural causes, is consistent with a past vaginal sexual assault.

29

Critically, here, the allegations were corroborated by DNA evidence. Nickel testified that, on the sperm fraction he discovered in the victim's underwear, he found a mixed profile, with one female contributor and one male contributor. Defendant was a potential contributor to the male profile in the sperm fraction. According to Nickel, it was 16.1 quadrillion times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. As to the nonsperm fraction, Nickel also discovered a mixed profile, one male and one female. According to Nickel, it was 33,800 times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. Also, Nickel testified that, if he did not have to dilute the sample before amplifying it in order to properly perform his analysis, the "profile would be a lot higher." While the defense relied on a theory of DNA transfer in the washing machine, this theory was seriously undermined by (1) Nickel's opinion, based on a stain in the underwear and epithelial cells found in a cutting, that the underwear had not been recently washed, and (2) the fact that the amount of DNA detected was much greater than the volume of DNA that had been detected in the studies involving the transfer of DNA in washing machines, so much so that secondary transfer could be excluded as an explanation of the presence of defendant's DNA.

Moreover, the jury here was not "bombarded" with evidence concerning the low statistical incidence of false allegations of child sexual abuse, nor was the jury presented with "a mountain of prejudicial statistical data." (*Julian, supra*, 34 Cal.App.5th at pp. 888, 889.) Instead, Carmichael testified about the low statistical incidence of false allegations briefly on direct examination, his testimony on the subject, including the prosecutor's questions, occupying little more than a single page of the reporter's transcript. On cross-examination, defense counsel asked Carmichael about his direct testimony concerning false allegations: "I think the number you used was between zero to six percent. In some instances the numbers you gave were 30 to 35 percent. You find more false allegations; fair to say?" Carmichael testified that there "are some articles that

30

I referred to that do report a higher rate of false allegations, again, within the context of custody and parents making the allegations." After discussing two studies that found few or no instances of false allegations made by children themselves, Carmichael testified that "a vast majority of research since that time has shown low rates of false allegations by kids." However, Carmichael acknowledged that, while the incidence may be low, the occurrence of false allegations made by children does exist. Defense counsel's cross-examination on the subject encompassed roughly two pages in the reporter's transcript.

We acknowledge that the prosecution did discuss Carmichael's testimony in closing argument. The prosecution argued to the jury: "And how do we know he molested [the victim]? No one influenced her to make this up. No one has been benefited by the horrendous year of [the victim] losing her sisters, the defendant, caregivers, vacation planner. She has no motive to make this up. [¶] Dr. Carmichael told you false allegations are like zero to 5 percent, and that small number is in child custody cases. This is not a child custody case."

But, as we have noted, as to Carmichael's testimony, the court instructed the jury: "testimony about these matters is not evidence that the defendant committed any of the crimes charged against him." And we presume the jury understood and followed this instruction. (*Wilson, supra,* 44 Cal.4th at p. 803.)

Given the strength of the evidence, particularly the DNA evidence, we conclude that had Carmichael been precluded from testifying about the statistical data concerning false accusations and the prosecution did not make the above argument during closing argument, it is not reasonably probable defendant would have obtained a different result.

### D. Conclusion

The trial court did not abuse its discretion in admitting the CSAAS testimony as a general matter. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1304.) The admission of CSAAS evidence generally did not render defendant's trial fundamentally unfair in violation of due process. (*Patino, supra*, 26 Cal.App.4th at p. 1747.) Furthermore, defendant was not

prejudiced from evidence indicating the statistical rarity of false accusations. (See *Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

## II. CALCRIM No. 1193

### A. Additional Background

At a conference on the jury instructions, the court stated that it made a slight modification to CALCRIM No. 1193 "because the witness never really used the term 'syndrome,' the accommodation syndrome language. So I just rephrased it a little . . . ." The defense objected to the language as phrased, expressing the preference that the instruction actually refer to CSAAS, noting that Carmichael was cross-examined extensively about it. The defense raised no additional objection to CALCRIM No. 1193 as proposed by the court, and subsequently agreed that the defense was "okay with all the instructions as the Court proposes to give them." On a subsequent day, referencing the final instructions, the court asked the defense "are you okay with the instructions" and counsel for defendant replied, "yes."

The trial court instructed the jury with a modified version of CALCRIM No. 1193 as follows: "You've heard testimony from Dr. Blake Carmichael regarding *certain characteristics of children who suffer from sexual abuse and* child sexual abuse accommodation syndrome. Dr. Carmichael's testimony *about these matters* is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." The italicized language was added by the trial court to the pattern instruction's language.[14]

---

[14] The standard CALCRIM No. 1193 language reads as follows: "You have heard testimony from _____ *<insert name of expert>* regarding child sexual abuse accommodation syndrome. [¶] _____'s *<insert name of expert>* testimony about

## B. Defendant's Contentions

On appeal, defendant does not complain about the language modified by the trial court. He focuses on the last sentence of the standard pattern instruction. He complains that CALCRIM No. 1193 "is flawed because the last sentence essentially told the jurors they could base their verdict on assumptions inherent in CSAAS testimony. In other words, jurors could make infer [*sic*] the molestation occurred if [the victim's] conduct was not inconsistent with the conduct of someone exhibiting symptoms of CSAAS." In short, defendant asserts that the instruction is problematic because the pattern instruction's "last paragraph leaves open an interpretation the jury could consider the evidence as proof of molestation because it relates to [the victim's] believability." Defendant asserts that the erroneous instruction could have caused the jury to misinterpret the law and compromised his due process right to a reliable jury determination of guilt beyond a reasonable doubt by lessening the prosecution's burden of proof. Defendant further asserts that the error was prejudicial under any standard.

## C. Forfeiture and Section 1259

Tacitly acknowledging that the issue is not preserved for appellate review, defendant asserts that his contention may be reviewed because the instruction affected his substantial rights (§ 1259), and, alternatively, asserts that, if we determine that his contention was forfeited, then he was deprived of the constitutionally effective assistance of counsel.

Defense counsel participated with the trial court in refining the CALCRIM No. 1193 instruction to be given to the jury based on the circumstances of this case. The

---

child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not _____'s <*insert name of alleged victim of abuse*> conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

33

defense raised no objection to CALCRIM No. 1193 as proposed by the court, and subsequently agreed on two occasions that the defense was "okay with all the instructions as the Court proposes to give them." However, as defendant asserts, we may review his contention concerning an instruction given "if the substantial rights of the defendant were affected thereby."[15] (§ 1259.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Accordingly, we shall proceed to consider the merits of defendant's contention.

### D. Analysis

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.)

---

[15] The People assert that defendant invited any error by urging the trial court to adopt the model instruction. " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, [our high court has] found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) "Error is invited only if defense counsel affirmatively causes the error and makes 'clear that [he] acted for tactical reasons and not out of ignorance or mistake' or forgetfulness." (*People v. Lara* (2001) 86 Cal.App.4th 139, 165, quoting *Wickersham*, at p. 330.) Trial counsel's failure to detect the flaw in CALCRIM No. 1193 that appellate counsel perceives does not demonstrate a tactical intent to induce the purported error now claimed. (*People v. Moore* (2011) 51 Cal.4th 386, 410.) We cannot apply the invited error doctrine here.

Arguments similar to defendant's have been rejected by other courts. (*Munch*, *supra*, 52 Cal.App.5th at p. 474, citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504; see also *Lapenias*, *supra*, 67 Cal.App.5th at p. 175 [noting that courts have held CALCRIM No. 1193 "accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof"].) " 'A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior*. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Munch*, at p. 474, quoting *Gonzales*, at p. 504.) We join the *Lapenias*, *Munch*, and *Gonzales* courts in holding the portion of the instruction about which defendant complains on appeal accurately instructs the jury on the proper use, and proper limitations on the use, of CSAAS evidence.

### III.  Substantial Evidence — Count Three, Attempted Lewd Acts

### A.  Defendant's Contentions

Defendant asserts that his conviction of attempted lewd and lascivious act charged in count three is not supported by substantial evidence. According to defendant, the prosecution's theory—that defendant asked the victim to have sex and she said no—is insufficient to establish an attempt. Defendant asserts that his conduct did not go beyond mere preparation, and soliciting a minor to commit a sex act is insufficient to support a conviction of attempt.

## B. Standard of Review and Elements of Count Three

" 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied.'  [Citation.]  'Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.' " (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411 (*Lucero*), quoting *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

"We must accept all logical inferences that the jury may have drawn from circumstantial evidence." (*Lucero, supra*, 41 Cal.App.5th at p. 411, citing *People v. Maury* (2003) 30 Cal.4th 342, 396.)  " ' "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*Lucero*, at p. 411, quoting *People v. Kaufman* (2017) 17 Cal.App.5th 370, 381.)  "It is well settled that ' "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon *no hypothesis whatever* is there sufficient substantial evidence to support" ' the jury's verdict." ' " (*Lucero*, at p. 411, quoting *People v. Penunuri* (2018) 5 Cal.5th 126, 142; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Spencer* (1969) 71 Cal.2d 933, 937.)

On count three, the jury found defendant guilty of attempting to commit a lewd or lascivious act on a child under the age of 14.  (§§ 664, 288, subd. (a).)  Section 288, subdivision (a), provides:  "Except as provided in subdivision (i), a[16] person who

---

[16] The version of section 288, subdivision (a), in effect at the time of the charged offenses actually applied to "any person" rather than "a person."  (§ 288, former subd. (a).)

willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." Thus, the elements to prove a violation of section 288, subdivision (a), are that (1) the defendant "willfully touched any part of a child's body either on the bare skin or through the clothing" or the defendant "willfully caused a child to touch (his/her) own body, the defendant's body, or the body of someone else, either on the bare skin or through the clothing"; (2) the defendant "committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of (himself/herself) or the child"; and (3) the "child was under the age of 14 years at the time of the act." (CALCRIM No. 1110.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Thus, " '[t]o sustain a conviction of attempted violation of section 288(a), the prosecution has the burden of demonstrating (1) the defendant intended to commit a lewd and lascivious act with a child under 14 years of age, and (2) the defendant took a direct but ineffectual step toward committing a lewd and lascivious act with a child under 14 years of age.' " (*People v. Villagran* (2016) 5 Cal.App.5th 880, 890, quoting *People v. Singh* (2011) 198 Cal.App.4th 364, 368.) Defendant's contentions relate only to the "direct but ineffectual step" element.

### C. Analysis

The prosecution presented evidence from the victim's SAFE interview that the victim and defendant were snuggling and he licked her armpit. He asked her what she wanted to lick, and she said his tummy. She licked his bellybutton. Defendant then pulled out his "wiener" under the blanket and "was squishing it, 'cause it . . . felt good."

Defendant asked the victim to have sex and she said no. The victim and defendant were "talking backwards," "no means yes and yes me [*sic*] no," and the victim said no. Defendant said, "[h]ow about I, I have it with your doll." Defendant started pushing on the vagina area of the victim's doll like he was having sex.

Based on the evidence before them, the jurors could reasonably have concluded that defendant asked the victim to have sex with him and, when she refused, tried to manipulate or trick her into having sex with him through the "talking backwards" game to obtain her consent. The jurors also could reasonably have concluded defendant attempted to overcome her resistance through simulating sex with her doll, showing her that what he wanted to do was "okay," or hoping she might decide to protect her doll by substituting herself in its place. Defendant's acts constitute multiple direct but ineffectual steps towards achieving his goal of having sex with the victim. And the jury could have reasonably inferred that, had the victim relaxed her resistance to defendant's words and actions or sought to save her doll by consenting, he would have had sex with her. The acts in furtherance need only be "slight." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8, quoting *People v. Anderson* (1934) 1 Cal.2d 687, 690 [" 'whenever the design of a person to commit crime is clearly shown, *slight acts* in furtherance of the design will constitute an attempt' " (italics added)]; see also *People v. Ansaldo* (1998) 60 Cal.App.4th 1190, 1196 (*Ansaldo*), citing *People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) Defendant's acts here constitute far more than "slight" acts in furtherance of his clear intent to commit a lewd and lascivious act with the victim and to have sex with her. Substantial evidence supported the guilty verdict on count three.

Relying on *People v. La Fontaine* (1978) 79 Cal.App.3d 176, disapproved on another ground in *People v. Lopez* (1998) 19 Cal.4th 282, 292, defendant asserts that conduct consisting only of verbal communication is preparation only and does not constitute attempt. In *La Fontaine*, the defendant picked up a hitchhiker, and asked the

hitchhiker if he wanted to make five or ten dollars by allowing the defendant to give him a blow job. (*La Fontaine*, at p. 179.) "At no time did [the] defendant touch any portion of [the hitchhiker's] body or make any movement or motion toward [the hitchhiker's] body." (*Id.* at p. 180.) The court held that this solicitation to commit a lewd act, without more, was insufficient to constitute an attempt to commit a lewd act in violation of section 288. (*La Fontaine*, at pp. 182-183.) As defendant acknowledges, several appellate decisions have declined to follow *La Fontaine* on this point. (See, e.g., *People v. Herman* (2002) 97 Cal.App.4th 1369, 1386 ["That an invitation to participate in the defendant's commission of a crime consists only of words does not mean it cannot constitute an 'act' toward the completion of the crime, particularly where the offense by its nature consists of or requires the requested type of participation"]; *Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 188; *Ansaldo, supra,* 60 Cal.App.4th at p. 1196.) We are not persuaded by the analysis in *La Fontaine*. Moreover, the question here is academic. As detailed *ante*, defendant did far more than tender one verbal solicitation for sex. He undertook a number of direct acts in addition to the solicitation in an effort to commit a lewd or lascivious act with the victim. (See *Hatch*, at p. 188 ["Even assuming *La Fontaine's* analysis remains good law, there is some evidence [the defendant] did try to touch [the victim]: after [the victim] refused to enter his truck, [the defendant] exposed himself, masturbated and extended his semen-covered hand toward her"].)

Defendant also asserts that the prosecutor's argument to the jury—that defendant asking the victim to have sex constituted the direct but ineffective step toward completion of the crime—effectively limited the jury on the theory upon which it could find defendant guilty under count three. He claims that, while the prosecutor pointed out what defendant did with the victim's doll, "it was not what [defendant] did with the doll, but rather his asking [the victim] that the prosecutor claimed was the 'ineffective step' making the crime attempt."

39

"Ordinarily, for purposes of substantial evidence review, 'the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury.' " (*People v. Brown* (2017) 11 Cal.App.5th 332, 341, quoting *People v. Perez* (1992) 2 Cal.4th 1117, 1126.) That rule applies here. The jury was not bound to focus only on the prosecutor's theory and neither are we. Moreover, count three, as alleged, specified that the factual allegations supporting the charge were that defendant "asked [the victim] to have S.A.X. *and when she said no and then he had SAX with her doll . . . .*"[17] (Italics added.)

Substantial evidence supported the conclusion that defendant was guilty of attempting to commit a lewd or lascivious act on a child under the age of 14 and defendant's contentions to the contrary are without merit.

## IV. Fines, Fees, and Penalty Assessments

Although not raised by the parties, we have noticed issues concerning fines and fees that require correction.

At sentencing, the trial court imposed a fine of "$500 habitual offender program," referring to the sex offender habitual offender fine pursuant to section 290.3. The abstract of judgment does not reflect the imposition of this fine. Accordingly, we shall order the abstract corrected to reflect the imposition of this fine.

The trial court also ordered defendant to pay $702 as a presentence report fee pursuant to section 1203.1b. This fee, too, does not appear on the abstract of judgment. We shall therefore order the abstract corrected to reflect the imposition of this fee.

The trial court ordered defendant to pay a fine of "$600 pursuant to [section] 243.4." Section 243.4 authorizes a fine up to $10,000 for a felon who commits sexual

---

[17] The verdict forms recited of the charged offense: "attempt to commit a lewd and lascivious act upon a child, to wit, asked [the victim] to have 'SAX' and when she said no he then had 'SAX' with her doll."

battery against a minor. (§ 243.4, subd. (j).) However, defendant was not convicted of sexual battery under section 243.4 and therefore that fine could not be imposed. "An unauthorized sentence may be corrected by an appellate court 'regardless of whether an objection or argument was raised in the trial and/or reviewing court.' " (*People v. Turner* (2002) 96 Cal.App.4th 1409, 1415, quoting *People v. Welch* (1993) 5 Cal.4th 228, 235; accord, *People v. Smith* (2001) 24 Cal.4th 849, 852.) We shall modify the judgment to strike the $600 fine imposed pursuant to section 243.4. However, because this fine does not appear on the abstract of judgment, we need not order the abstract corrected in this regard.

## DISPOSITION

The judgment is modified to strike the $600 fine imposed pursuant to section 243.4. The trial court is directed to prepare an amended abstract of judgment reflecting the judgment as modified and reflecting the trial court's oral imposition of a $500 sex offender habitual offender fine pursuant to section 290.3 and a $702 presentence report fee pursuant to section 1203.1b. The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is affirmed as modified.


　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　MURRAY, Acting P. J.


We concur:


　　　/s/
HOCH, J.


　　　/s/
KRAUSE, J.